IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
August 7, 2009 Session

# FORREST CONSTRUCTION COMPANY, LLC v. JAMES L. LAUGHLIN, II, ET AL. v. THOMAS B. NAIVE

**Appeal from the Chancery Court for Williamson County**
**No. 31153    Robert E. Lee Davies, Judge**

---

**No. M2008-01566-COA-R3-CV - Filed December 9, 2009**

---

This action involves a variety of claims arising from the construction of a residence in Williamson County. A homeowner, James Laughlin, entered into a cost plus contract with Forrest Construction Company, LLC to construct a home for he and his wife. Prior to the home being completed, Forrest Construction stopped work, filed a lien on the residence, and thereafter filed a breach of contract action against Mr. Laughlin and an action to recover damages based on the doctrine of quantum meruit against Mrs. Laughlin. Forrest Construction claimed that Mr. Laughlin was in breach of the contract for failure to pay according to the contract. Mr. and Mrs. Laughlin filed a counter-claim for negligent construction, gross negligence, negligence per se, breach of contract, and violations of the Tennessee Consumer Protection Act. The trial court found that Mr. Laughlin had materially breached the contract by failing to pay according to the terms of the contract, and awarded damages to Forrest Construction. Conversely, the trial court found for the Laughlins on their claim of negligent construction and awarded damages against Forrest Construction. Both parties appeal. Forrest Construction contends that the trial court erred in holding it liable for alleged defects because Mr. Laughlin committed the first material breach and failed to give Forrest Construction notice and the opportunity to cure the alleged defects. Mr. Laughlin contends the trial court erred in finding that he committed the first material breach. The Laughlins also contend the trial court erred in reducing the cost of the repairs to their residence and in failing to pierce the corporate veil. We find that Forrest Construction was the first to materially breach the contract by submitting requests for draws that were not properly supported by records of its costs and expenses as required by the contract, including submitting draws which erroneously included charges for work done on its other projects, and by failing to complete construction of the home. We, therefore, reverse the trial court's determination that Mr. Laughlin committed the first material breach and hold that Forrest Construction was the first to materially breach the contract. We affirm the trial court's determination that the Laughlins were excused from the duty to give notice of the alleged defects and an opportunity to cure; thus, the Laughlins are entitled to recover damages due to the negligent construction by Forrest. As for the trial court's substantial reduction of the damages requested by the Laughlins for the cost to repair the yet unrepaired defects to their home, we are unable to determine whether the trial court considered or overlooked $55,000 of the estimated cost to repair the defects; therefore, we remand this issue to afford the trial court the opportunity to either restate its previous ruling or to increase the award of damages, if it so determines, based on the evidence presently in

the record. As for the issue of piercing the corporate veil, we remand that issue for further proceedings.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court Affirmed in Part, Reversed in Part, and Remanded**

FRANK G. CLEMENT, JR., J., delivered the opinion of the court, in which ANDY D. BENNETT and RICHARD H. DINKINS, JJ., joined.

Christopher S. Dunn, Alyssa M. Leffall and William B. Herbert, Nashville, Tennessee, for the appellants, Forrest Construction Company, LLC, and Thomas B. Naive.

Donald Capparella, Nashville, Tennessee, for the appellees, James L. Laughlin, II, and Debbie Laughlin.

**OPINION**

This action arises from the construction of a residence in Williamson County for James and Debbie Laughlin. Forrest Construction Company, LLC entered into a construction contract with James Laughlin on July 11, 2003 for the construction of the Laughlins' new home.[1] For reasons unexplained by the record, Debbie Laughlin did not sign the contract; only James Laughlin and Thomas Naive, the sole owner and member of Forrest Construction, signed the contract.[2] Thus, James Laughlin and Forrest Construction are the only parties to the contract. However, Mrs. Laughlin is a defendant in this action as Forrest Construction filed a quantum meruit claim against her, and she joined her husband in filing a counter-claim against Forrest Construction for negligent construction, gross negligence, negligence per se, and violations of the Tennessee Consumer Protection Act.

The contract, which was a "cost plus" contract, provided that Forrest Construction would recover its actual net costs, plus 7% for "the contractor's overhead," plus an 8% profit, which was based on the "actual net costs of all direct materials, labor, services, and fees, that go into the entire project." The contract provided that Forrest Construction was to be paid pursuant to the cost plus formula on a weekly basis; it was to submit weekly requests for draws based on the cost of the work in the previous week plus overhead and profit. The contract also provided that each draw would be submitted with "full back-up support for all amounts requested" and that Forrest Construction "shall have full responsibility and obligation to keep full and accurate records of all costs and expenses to satisfy tax laws and Owner."

---

[1] The home was to be constructed based upon plans the Laughlins received from a designer.

[2] Naive signed the contract as Managing Agent for Forrest Construction but he signed on the line designated for "Owner," not the line designated for the "Managing Agent."

In order for the Laughlins to secure the construction loan needed to finance the project, Forrest Construction submitted an initial cost estimate to the Laughlins and their lender, Fifth Third Bank. The estimated cost of construction was $556,944.89. Based upon this estimate, the Laughlins secured two loans, a construction loan for $506,000 and an additional line of credit of $50,000 that was to be held in reserve. At the inception of the project, the Laughlins also made a "deposit" of $25,000 which Forrest Construction was to use only for the payment of work done in the absence of the Laughlins' ability to make the required draw payments.

Construction on the home began in mid-July of 2003. During the construction, the Laughlins made the decision to finish rooms in the home that were initially to be left "unfinished" and Forrest agreed to do the additional work. Despite the requirement that such changes be made by written change orders signed by both parties, no change orders were prepared or signed.

As construction progressed over the next few months, Forrest Construction submitted requests for draws directly to the Bank and the bank paid the draws in the amounts requested. In May 2004, Mr. Naive and Mr. Laughlin discussed the fact that the primary construction loan had been fully expended and that additional funds were needed to complete construction. Mr. Laughlin approved the use of the $50,000 from the second mortgage, which had been held in reserve, and he secured an additional $25,000 to cover additional construction costs.

When Forrest Construction submitted a draw request for its June work on July 6, 2004, there were not enough funds to cover the entire draw request; therefore, $12,000 remained unpaid. Despite the lack of funds, Forrest continued construction. Mr. Naive stated that work continued due to assurances from Mr. Laughlin and the Bank that funds would be forthcoming. Subsequently, Mr. Naive claimed that he personally incurred $87,101 in out-of-pocket expenses to cover the cost of work the Laughlins had not paid for.

In the interim, in an effort to secure additional funds, Mr. Laughlin requested a final cost estimate to complete construction on the home. On August 20, 2004, Mr. Naive submitted an estimate that it would cost an additional $50,584 to complete construction. With the unpaid balance of $87,101 in out-of-pocket expenses claimed by Mr. Naive, this resulted in a balance of $137,000.

Before agreeing to provide any additional funds for the project, Mr. Laughlin requested that Mr. Naive provide records of Forrest's expenses up to that point. On September 3, 2004, Mr. Naive provided Mr. Laughlin with a box of papers approximately two feet high. Mr. Laughlin described the contents of the box as miscellaneous invoices and check stubs that had no organization and which he found wholly unsatisfactory. Mr. Laughlin then requested a meeting for September 10, 2004.[3] On the morning of September 10, Mr. Laughlin filled out the required paperwork to secure

---

[3] Mr. Laughlin testified at trial that the box contained a large amount of invoices, receipts, and check stubs that covered not only the construction on the Laughlins' home, but also documents from various other Forrest Construction sites, and that he was unable to make sense of the records in terms of where the costs related to the work on the home.

an additional $145,000 from the Bank and that afternoon he met with Mr. Naive at a Chili's restaurant.

What occurred during the meeting at Chili's is disputed; in any event, it did not result in an amicable resolution. Mr. Laughlin claims that he expressed his concern with the lack of documentation to support the draw requests submitted by Forrest Construction, and due to this, he proposed new terms to settle their differences and complete construction of the residence. Mr. Laughlin states that he proposed paying $50,000 to complete the project, which would be paid directly to the workers. Of the $87,000 that Mr. Naive or Forrest Construction claimed to have incurred, Mr. Laughlin offered to pay $70,000 for the actual costs, excluding any profit, which would be made in installment payments. Though he admitted that Mr. Naive was initially upset over his proposal, Mr. Laughlin stated that Mr. Naive accepted the proposal. Mr. Naive, however, claims that Mr. Laughlin stated he would not pay the amount due under the contract, and while it may have appeared that he agreed to Mr. Laughlin's proposal, he made that statement in order to retrieve the box of documents that were still in Mr. Laughlin's possession. The meeting at Chili's then concluded.

Immediately after leaving Chili's, Mr. Naive drove to his attorney's office. Three days later, on September 13, 2004, Forrest Construction filed a Mechanic's and Materialmen's Lien in the amount of $124,050.25 on the Laughlins' home and immediately ceased all work on the residence. Meanwhile, unaware of the actions taken by Forrest, and believing that they had an agreement, Mr. Laughlin called Fifth Third Bank to authorize the release of the additional funds he had secured, and it was during this phone call that Mr. Laughlin learned of the lien. Upon this discovery, Mr. Laughlin placed a phone call to Mr. Naive who was unavailable. Mr. Naive never responded to the call and there was no further communication by the parties regarding the residence or its construction.

The Laughlins subsequently hired another contractor, Charles Atkinson, to finish the construction of their home. The first task of Mr. Atkinson was to complete the changes required by the City of Brentwood in its inspection report issued on October 6, 2004. Forty changes costing $28,324.17 were completed. The final construction costs for completing the residence were $38,324.17, well below the amount that Mr. Naive had estimated as his cost of completion.[4]

On December 8, 2004, Forrest Construction filed this action against James and Debbie Laughlin asserting claims for breach of contract and quantum meruit, and seeking enforcement of the lien filed against the home. The Laughlins answered on February 14, 2005, and filed a counter-claim against Forrest Construction requesting damages for negligent construction, gross negligence, negligence per se for failure to comply with applicable building codes, breach of contract, unjust enrichment, and violations of the Tennessee Consumer Protection Act based upon numerous problems that the Laughlins had discovered upon moving into their new home. Forrest Construction answered the Laughlins' counter-complaint on April 12, 2005 and denied any negligent

---

[4]The Laughlins moved into the completed home in January 2005.

construction.[5] In December 2005, the Laughlins amended their complaint to join Thomas Naive, the owner and sole member of Forrest Construction, as a party, and added a claim to pierce the corporate veil.

Following a bench trial that occurred over several days,[6] the trial court issued its first Memorandum Opinion on February 21, 2008, which was memorialized in a final judgment entered on February 27, 2008. The trial court found that the Laughlins were the first to breach the contract by their refusal to pay Forrest Construction according to the contract, and awarded Forrest Construction a total of $130,892.04 in damages against Mr. Laughlin for his breach of the contract.[7] In making its award, the court found that Forrest Construction was not limited to $25,000 in liquidated damages as the Laughlins contended the contract required. The trial court awarded $113,267.59 to Forrest Construction against Mrs. Laughlin under the theory of quantum meruit, as she was not a party to the contract.[8] Forrest also received an award of prejudgment interest.

On the Laughlins' counter-claims, the trial court found that they had incurred expenses in repairing "the defective and negligent work" of Forrest Construction. The trial court divided the defects in the home into two categories: those that the Laughlins had repaired and those that remained unrepaired. As to the defects that were repaired, the court held that the Laughlins were not entitled to recovery because they had been the first to materially breach the contract, and thus were required to give Forrest Construction notice of the defects and an opportunity to cure, which they had not done. For the defects in the home that were unrepaired, the trial court found that Forrest Construction had breached its duty to construct the home in a "workmanlike manner," and awarded $74,000 to the Laughlins in damages. The trial court found no violation of the Tennessee Consumer Protection Act, and refused to pierce the corporate veil finding that the issue was "moot" because the award in favor of Forrest Construction on its breach of contract claim.

Following the court's ruling, both parties filed motions to alter or amend the judgment. The trial court issued a second memorandum opinion modifying its previous ruling in which the court found that the Laughlins were *not* barred from recovering for the defects that had been repaired, as they were excused from the requirement to give notice and opportunity to cure because "it was extremely unlikely that Forrest Construction would have attempted to cure." Based upon this new finding, the trial court awarded the Laughlins an additional $51,637.52 in damages. The trial court also lowered the amount of Forrest Construction's award on which prejudgment interest applied. As

---

[5] On April 5, 2005, the Laughlins filed a Motion for Default Judgment, however, this motion was not heard as Forrest Construction filed its answer shortly thereafter.

[6] The trial was held on July 25-26, 2007, January 22-24, 2008, and concluded on February 5, 2008.

[7] The trial court awarded $113,267.59 to Forrest Construction against James Laughlin for breach of contract, which was for its actual construction costs plus seven percent for overhead and an additional eight percent for profit.

[8] The court did not include an award for profit or overhead against Mrs. Laughlin because she was not a party to the contract.

a result of the revisions in its rulings, the total damages awarded to Forrest Construction were $134,521.88, and the total damages awarded the Laughlins were $137,875.59.[9] With the offsetting awards, Forrest Construction owed the Laughlins $3,335.71. This appeal followed.

## STANDARD OF REVIEW

The interpretation of a contract is a question of law. *Guiliano v. Cleo, Inc*. 995 S.W.2d 88, 95 (Tenn. 1999). Therefore, the trial court's interpretation of a contract is not entitled to a presumption of correctness under Tenn. R. App. P. 13(d) on appeal. *Angus v. Western Heritage Insurance* Co., 48 S.W.3d 728, 739 (Tenn. Ct. App. 2000). Accordingly, we will review these contractual issues de novo and reach our own independent conclusions regarding their meaning and legal import. *Guiliano*, 995 S.W.2d at 95; *Hillsboro Plaza Enterprises v. Moon*, 860 S.W.2d 45, 47 (Tenn. Ct. App. 1993).

The cardinal rule for interpretation of contracts is to ascertain the intention of the parties and to give effect to that intention consistent with legal principles. *Rainey v. Stansell*, 836 S.W.2d 117, 119 (Tenn. Ct. App. 1992); *Bob Pearsall Motors, Inc. v. Regal Chrysler-Plymouth, Inc*., 521 S.W.2d 578 (Tenn. 1975). A primary objective in the construction of a contract is to discover the intention of the parties from a consideration of the whole contract. *McKay v. Louisville & N.R. Co.*, 182 S.W. 874 (Tenn. 1916). In construing contracts, the words expressing the parties' intentions should be given their usual, natural, and ordinary meaning, *Taylor v. White Stores, Inc*., 707 S.W.2d 514 (Tenn. Ct. App. 1985), and neither party is to be favored in the construction. *Ballard v. North American Life Ins*. Co., 667 S.W.2d 79 (Tenn. Ct. App. 1983). All provisions in the contract should be construed in harmony with each other, if possible, to promote consistency and to avoid repugnancy between the various provisions of a single contract. *Guiliano*, 995 S.W.2d at 95 (citing *Rainey v. Stansell*, 836 S.W.2d 117, 118-19 (Tenn. Ct. App. 1992)). The court, at arriving at the intention of the parties to a contract, does not attempt to ascertain the parties' state of mind at the time the contract was executed, but rather their intentions as actually embodied and expressed in the contract as written. *Rainey*, 836 S.W.2d at 118-119 (citing *Sutton v. First National Bank of Crossville*, 620 S.W.2d 526 (Tenn. Ct. App. 1981)).

With regard to findings of fact by a trial court, we review the record de novo and presume that the findings of fact are correct unless the preponderance of the evidence is otherwise. Tenn. R. App. P. 13(d). We also give great weight to a trial court's determinations of credibility. *Estate of Walton v. Young*, 950 S.W.2d 956, 959 (Tenn. 1997); *B & G* Constr*., Inc. v. Polk*, 37 S.W.3d 462, 465 (Tenn. Ct. App. 2000). However, if the trial judge has not made a specific finding of fact on a particular matter, we will review the record to determine where the preponderance of the evidence lies without employing a presumption of correctness. *Ganzevoort v. Russell*, 949 S.W.2d 293, 296 (Tenn. 1997).

---

[9] The trial court awarded discretionary costs to both parties, which are included in the final award amounts.

ANALYSIS

Forrest Construction contends that the trial court erred in holding it liable for the alleged construction defects because the Laughlins committed the first material breach and failed to give Forrest notice and opportunity to cure the alleged defects. It argues that the trial court erred in finding that the Laughlins were excused from the duty to give notice for the defects that had been repaired, and also erred in failing to apply the duty to give notice and opportunity to cure for the alleged defects that had yet to be repaired.

For their issues, the Laughlins contend that Forrest Construction committed the first material breach of the contract by failing to provide the required "accounting" of its costs. They also contend they did not commit a material breach, because they never refused to pay pursuant to the contract, instead, the proposal at Chili's was to resolve the dispute over the computation of the construction costs. They also contend that the trial court erred in failing to apply the liquidated damages provision of the contract, failing to pierce the corporate veil, and reducing the damages awarded for the construction defects that have yet to be repaired.

### WHICH PARTY WAS THE FIRST TO MATERIALLY BREACH THE CONTRACT

The Laughlins contend that Forrest Construction committed the first material breach of the construction contract by failing to properly document and account for the expenses it sought to recover in its draw requests. In response, Forrest contends that the documentation and accounting it provided were sufficient and that the Laughlins were the first to materially breach the contract by refusing to pay these requests in accordance with the terms of the contract.

### THE RELEVANT PROVISIONS OF THE CONTRACT

In order to determine which party was the first to materially breach the contract, we must first determine what the contract required of the parties, which is a question of law. *See Guiliano*, 995 S.W.2d at 95; *Angus*, 48 S.W.3d at 739. Therefore, we will conduct a de novo review of the contract to determine the parties' respective responsibilities. *Id*.

The contract entered into by the parties is a cost plus contract, which is defined as a "contract in which payment is based on a fixed fee or a percentage added to the *actual cost* incurred." Black's Law Dictionary Abridged (Seventh Edition) (2000) (emphasis added). In the matter of *Vakili v. Hawkersmith*, this Court noted that cost-plus contracts are commonly used in the construction industry and "[b]y definition, they generally provide that the contractor will complete construction with no specific cost for the construction." *Vakili*, No. M2000-01402-COA-R3-CV, 2001 WL 1173285, at * 3 (Tenn. Ct. App. October 5, 2001); *see also Rodgers v. Walker*, No. 03A01-9708-CH-00371, 1998 WL 670381, at *3 (Tenn. Ct. App. 1998) (holding that even when a cost-plus contract contains an estimated price, "[w]hen an estimate is provided in a cost plus contract it is simply that – an estimate, not a fixed price or guaranteed maximum").

The contract at issue is surprisingly short; it is comprised of twelve succinct paragraphs in less than three pages. The provisions that are most relevant to the issue appear in two paragraphs:

> 3. **Building Price** - The building price shall be *the actual net costs of all direct materials, labor, services, and fees, that go into the entire project* plus six[10] percent (7%) Contractor's overhead. Contractor to receive eight percent (8%) profit based on actual costs including overhead. (Emphasis added).

> 5. **Draw Request** - Contractor shall be allowed to make draw requests to pay the costs as set forth and in accordance with the Estimated Cost Budget.[11] Each request shall be timely submitted to Owners construction lender with *full back-up support for all amounts requested.* Draw requests shall fund within twenty-four hours of receipt from Contractor. *Contractor shall have full responsibility and obligation to keep full and accurate records of all costs and expenses to satisfy tax laws and Owner.* (Emphasis added).

When interpreting a contract, "the words expressing the parties' intentions should be given their usual, natural and ordinary meaning." *Taylor*, 707 S.W.2d at 514. The relevant words the parties expressed in this contract establish with great clarity that James Laughlin was contractually obligated to pay "the *actual net costs of all direct materials, labor, services*, and fees, that go into the entire project" plus overhead and profit. Under the contract, Mr. Laughlin was obligated to make such payments weekly; however, this obligation to remit payment was subject to the condition precedent that Forrest submit accurate draw requests for "work performed on the construction of the Home . . . with full back-up support for all amounts requested." Moreover, and significantly, Forrest had the "full responsibility and obligation to keep full and *accurate records* of all costs and expenses. . . ." (Emphasis added).

The relevant words the parties expressed in this contract clearly establish that Mr. Laughlin was not obligated to pay Forrest *until* Forrest submitted the requisite documentation to establish that Mr. Laughlin was to pay the actual net costs of all direct materials, labor, services, and fees that went into the home (plus applicable overhead and profit). Therefore, we must determine whether Forrest satisfied the condition precedent; if not, Mr. Laughlin was not contractually obligated to approve the draw requests, and, thus was not in material breach of the contract.

---

[10] The contract contained a patent error, stating that the Contractor would receive "six percent (7%) Contractor's overhead." The trial court resolved the conflict and determined the percentage was seven (7%) percent.

[11] Paragraph 4 of the contract entitled "**Construction Funds**" stated that "funds will be available to Contractor for Contractor's use to fund weekly draw requests for work performed on the construction of the Home. . . ." The "available funds" were held by the Laughlins' bank, Fifth Third Bank. Forrest's draw requests were submitted directly to the bank; the bank then remitted payment to Forrest and charged that amount against the Laughlins' construction loan.

The trial court held that James Laughlin materially breached the contract by refusing to pay Forrest Construction according to the contract's terms. This decision was based upon a finding that Mr. Laughlin's statements to Mr. Naive during their meeting at Chili's constituted an anticipatory repudiation of the contract and a material breach of the contract.[12] We, however, have concluded that Forrest Construction failed to satisfy a contractual condition precedent necessary to obligate Mr. Laughlin to remit future payments to Forrest Construction; therefore, Mr. Laughlin did not anticipatorily repudiate the contract nor materially breach the contract.

We review specific findings of fact by a trial court with a de novo review of the record, with the presumption that the findings of fact are correct unless the preponderance of the evidence is otherwise. Tenn. R. App. P. 13(d). However, if the trial judge did not make a specific finding of fact on a particular issue, we review the record to determine where the preponderance of the evidence lies without employing a presumption of correctness. *Ganzevoort*, 949 S.W.2d at 296. Significant to our review of this issue is that the trial court did not make specific findings of fact concerning the sufficiency of the draw requests or the sufficiency of Forrest Construction's response to Mr. Laughlin's request for more accurate documentation of the costs he was asked to pay. Because the trial court did not make specific findings of fact concerning whether Forrest Construction complied with the express provisions in paragraphs 3 and 5 of the contract – stating only that it submitted all check copies and invoices related to the construction of the Laughlins' home – we will employ the less deferential standard of review stated in *Ganzevoort* and ascertain where the preponderance of the evidence lies as to this issue.

The trial court's ruling that Mr. Laughlin materially breached the contract is based on the erroneous assumption that Forrest Construction fulfilled its contractual obligation to accurately bill Mr. Laughlin for *the actual net costs of all direct materials, labor, services, and fees* that went into the construction of his home. In this regard the trial court stated in the summary of facts in the first Memorandum Opinion that "[Mr.] Laughlin requested and received from Naive *all* original check copies and invoices related to the construction on his home." We do not necessarily disagree with

---

[12]Mr. Laughlin and Mr. Naive presented differing accounts of the meeting at Chili's. After hearing the conflicting testimony, the trial court made the following finding of what occurred at this meeting:

> Laughlin called Naive and the two agreed to meet at Chili's on the afternoon of September 10. At this meeting, Laughlin informed Naive, although he had received the additional funds, he was not going to pay pursuant to their prior agreement. Instead, Laughlin proposed Naive would not receive any additional profit (15%) over the original estimated cost of the contract. As to the out-of-pocket expenses paid by Forrest of $87,101, Laughlin would pay 25% of that amount on September 15, another 25% at the time the Laughlins moved in, and the remaining balance ninety days later.

> The trial court noted that "Mr. Laughlin's version of his proposal is somewhat different in terms of the payments, but both parties testified Forrest would not receive the 15% profit and remaining payments would be made over time." Based upon these findings, the court ruled that Mr. Laughlin materially breached the contract when he informed Mr. Naive that he did not intend to pay Forrest Construction for the work in July and August.

the finding that Mr. Laughlin received from Mr. Naive all original check copies and invoices related to the construction on his home; the problem is that Mr. Laughlin received from Mr. Naive a two-foot-thick pile of disorganized papers, many of which pertained to expenses Forrest Construction incurred at other jobs during the same time period, wholly unrelated to the construction of the Laughlins' home.

"In any cost-plus contract there is an implicit understanding between the parties that the cost must be reasonable and proper." *Kerner v. Gilt,* 296 So.2d 428, 431 (La. App. 4 Cir., 1974). "The contractor is under a duty of itemizing each and every expenditure made by him on the job and where the owner denies being indebted to the contractor the latter has the burden of proving each and every item of expense in connection with the job." *Id*. (citing *Wendel v. Maybury*, 75 So.2d 379 (Orl. La. App. 1954); *Lee v. National Cylinder Gas Co.*, 58 So.2d 568 (Orl. La. App. 1952)); *see also* 17A Am Jur. 2d Contracts, Sec. 495 (2008). Forrest Construction never itemized the expenditures it sought to recover from Mr. Laughlin. Instead, it submitted essentially unsubstantiated requests for draws. Moreover, when called upon to provide proper documentation and itemization of the costs, it provided a wholly disorganized, un-itemized box of documents, many of which were unrelated to the Laughlins' home. Forrest Construction failed to identify or itemize the charges that pertained to the Laughlins' home only, or charges for which the Laughlins may be partly but not wholly responsible. The box of documents – a two-foot-thick pile of check copies and invoices – that Forrest Construction provided was not sufficient to establish "the actual net costs of all direct materials, labor, services, and fees" that went into the Laughlins' home, nor were the prior draw requests. Moreover, Forrest Construction never provided "full back-up support for all amounts requested" and it failed to provide "accurate records."

During the trial, Forrest Construction submitted only a spreadsheet of its expenses and a so-called "representative sample" of invoices and receipts. The spreadsheet, however, provided no details, it simply listed check numbers and amounts of checks that Forrest Construction had written during the time frame the Laughlins' home was under construction. What is significant is the spreadsheet failed to identify that the expenditures pertained to materials, labor, services, and fees that went into the construction of the Laughlins' home. It is undisputed that Mr. Laughlin requested documentation from Forrest Construction to account for the actual costs of construction. Forrest Construction responded by providing Mr. Laughlin with a box filled with numerous receipts and invoices from suppliers, subcontractors, etc. What is significant about the box of miscellaneous papers is the lack of organization that typically goes with billing and accounting, and the fact it contained bills wholly unrelated to the Laughlins' home. Moreover, Mr. Laughlin testified that the two-foot-thick pile of disorganized receipts and invoices did not answer his questions regarding costs he had paid previously and costs he was being asked to pay to complete his home. Mr. Laughlin also testified that when he asked Mr. Naive to provide additional information and documentation concerning costs related to his home, he was informed by Mr. Naive that the box contained the full and complete records of the construction on his home and no other information would be provided. Mr. Naive provided no contradiction to Mr. Laughlin's testimony concerning the documentation he provided.

The contract obligated Forrest to document "the actual net costs of all direct materials, labor, services, and fees that go into the entire project." Forrest merely provided a very disorganized array of its expenditures. The delivery of this box of invoices and receipts fell far short of its contractual obligation to establish that its expenditures were for materials, labor, services, and fees that went into the Lauglins' home and not for other projects. We also find it very significant that the so-called representative sample of invoices and receipts Forrest submitted in the draw requests did not match the spreadsheet submitted at trial. The sample submitted by Forrest Construction contained only fifteen invoices, which accounted for only $33,772.66 of costs, representing less than five percent of the cost to construct the home,[13] and "payment records" of Forrest Construction, which consisted of handwritten notes and word processor documents with simply a check number and the amount of the check, but without the identity of the payee or the item denoted.

Whether a party has fulfilled its obligations under a contract or is in breach of the contract is a question of fact. *See Carter v. Krueger*, 916 S.W.2d 932, 934-35 (Tenn. Ct. App. 1995). Having closely examined the evidence in this record, we find that the preponderance of the evidence demonstrates that Forrest Construction failed to provide what the contract required, appropriate documentation, and failed to provide accurate requests for draws based on the actual net costs of all direct materials, labor, services, and fees that went into the construction of the Laughlins' home. As stated earlier, this was a condition precedent to Mr. Laughlin's obligation to fund – pay – Forrest Construction's draw requests. Because Forrest Construction failed to fulfill this material condition precedent under the contract, Mr. Laughlin's statement at Chili's that he would not remit further payments based on Mr. Naive's requests for payment was not a breach. Therefore, Mr. Laughlin did not breach the contract, and because Mrs. Laughlin was not a party to the contract, she could not be in breach of the contract. Thus, we reverse the award of damages to Forrest Construction on its breach of contract claim against Mr. Laughlin. We will now determine whether Forrest Construction materially breached the contract.

BREACH OF FORREST CONSTRUCTION

Forrest Construction immediately ceased all work on the Laughlins' home following the meeting at Chili's on September 10, 2004. Three days later, Forrest Construction filed a Mechanic's and Materialmen's Lien in the amount of $124,050.25 on the Laughlins' home. Meanwhile, unaware of the actions taken by Forrest, Mr. Laughlin called Fifth Third Bank to authorize release of the additional funds he had secured at which time he learned of the lien. Upon this discovery, Mr. Laughlin called Mr. Naive to discuss the matter but Mr. Naive was unavailable, Mr. Naive never responded to Mr. Laughlin's call, and there were no further communications with Mr. Naive thereafter.

Due to Mr. Naive's refusal to communicate with Mr. Laughlin and because the construction of their home was not completed, the Laughlins hired Charles Atkinson to finish the job and to repair

---

[13] The total cost to construct the Laughlins' home was $719,629.

-11-

defects in the work done by Forrest Construction, including noncompliance with various building codes. Thereafter, on December 8, 2004, Forrest Construction filed this action against the Laughlins.

As we previously discussed, Mr. Laughlin was not in breach of the contract when Forrest Construction ceased all work on the Laughlins' home and filed the lien against the residence. Ceasing all work on the home without cause and failing to return to the job site to complete the work constituted a breach of contract by Forrest Construction. We must therefore determine whether this constituted a material breach.

To determine whether a breach is material, Tennessee looks to Section 241 of the Restatement (Second) of Contracts. *Adams TV, Inc. v. ComCorp of Tenn.*, 969 S.W.2d 917, 921 (Tenn. Ct. App. 1997) (citing *McClain v. Kimbrough Constr. Co., Inc.*, 806 S.W.2d 194, 199 (Tenn. App. 1990); Restatement (Second) of Contracts, § 241 (1981)). The following are the factors in determining whether a breach is material:

(a) the extent to which the injured party will be deprived of the benefit which he reasonably expected;
(b) the extent to which the injured party can be adequately compensated for the part of that benefit of which he will be deprived;
(c) the extent to which the party failing to perform or to offer to perform will suffer forfeiture;
(d) the likelihood that the party failing to perform or to offer to perform will cure his failure, taking account of all the circumstances including any reasonable assurances;
(e) the extent to which the behavior of the party failing to perform or to offer to perform comports with standards of good faith and fair dealing.

Restatement (Second) of Contracts, § 241.

A review of the applicable factors in Restatement (Second) of Contracts § 241 stated above makes it readily apparent that Forrest Construction's breach was a material breach, and, as the trial court correctly found, there was little likelihood that Forrest Construction would cure its breach.

The trial court's award of damages to Forrest Construction for breach of contract was based upon the finding that Forrest Construction was not the first party to breach the contract and that Mr. Laughlin caused the first material breach. We have ruled that it was Forrest Construction that was the first and only party to materially breach the contract. Mr. Laughlin did not breach the contract by failing to remit payments demanded by Mr. Naive; nevertheless, the party that first materially breached a contract is "not entitled to damages stemming from the other party's later material breach of the same contract." *See United Brake Sys., Inc. v. American Envtl. Protection*, 963 S.W.2d 749, 756 (Tenn. Ct. App. 1997) (quoting *McClain v. Kimbrough Const. Co.*, 806 S.W.2d 194, 199 (Tenn. App. 1990); *Santa Barbara Capital Corp. v. World Christian Radio Found, Inc.*, 491 S.W.2d 852, 857 (Tenn. App. 1972)) (holding there can be no recovery for damages in a breach of contract action by the party who himself breached the contract). Therefore, the material breach of Forrest

Construction, which occurred first, would render any subsequent breach by the Laughlins moot. *Id*.; *McClain*, 806 S.W.2d at 199.

Because Forrest Construction was the first and only party to materially breach the contract, it is not entitled to damages for Mr. Laughlin's alleged failure to timely pay amounts due pursuant to the terms of the contract. Mr. Laughlin, of course, would be entitled to recover damages stemming from Forrest Construction's cessation of work, and thus its failure to complete the construction of the home. "When a contractor fails to perform a contract for construction or fails to complete the project, then the measure of damages sustained by the owner is the difference between the contract price and the cost of finishing the work according to the contract." *Custom Built Homes v. McNamara*, No. M2004-02703-COA-R3-CV, 2006 WL 3613583, at *6 (Tenn. Ct. App. Dec. 11, 2006) (quoting *Harley v. Harrison*, No. M2005-02099-COA-R3-CV, 2006 WL 2644372, at *3 (Tenn. Ct. App. Sept. 13, 2006) (citing *St. John v. Bratton*, 150 S.W.2d 727, 728 (Tenn. Ct. App. 1941)). Mr. Laughlin, however, did not seek damages for the cost of completion to his home.[14]

Despite Forrest Construction's breach, it would be entitled to recover the reasonable actual costs of the work that went into the Laughlins' home. *See Rodgers v. Walker*, No. 03A01-9708-CH-00371, 1998 WL 670381 (Tenn. Ct. App. Sept. 30, 1998). This is because while the Laughlins are entitled to damages that would put them in the position they would have been in had Forrest Construction not breached, they are not entitled to profit from that breach. *Id*. at *4 (citing *Hennessee v. Wood Group Enterprises, Inc.*, 816 S.W.2d 35 (Tenn. Ct. App. 1991)). At trial, Forrest presented evidence, a spread sheet and a modest sampling of bills, in its effort to establish that it incurred an additional $87,000 of costs for work on the Laughlins' home. As we noted previously, Forrest Construction had a duty to maintain full and accurate records of all costs and expenses "to satisfy tax laws and Owner," i.e., Mr. Laughlin; yet, Forrest Construction failed to do so. The spread sheet Forrest relied upon at trial, which was only supported by a minuscule sampling of documentation, was wholly inadequate to establish that it was entitled to an additional payment of $87,000, over and above the approximately $580,000, it had already been paid for its work on the Laughlins' home.[15] Accordingly, we find that Forrest Construction is not entitled to any additional funds for its services.[16]

---

[14] The Laughlins' claim for negligent construction and the subsequent liability of Forrest Construction will be discussed in a later section of this opinion.

[15] Forrest Construction also used the $25,000 advance deposit made by the Laughlins, which was to be held in reserve for liquidated damages, to cover its construction costs.

[16] In *Rodgers*, the court also held that the contractor would be entitled to his fee in addition to the actual costs incurred. *Rodgers*, 1998 WL 670381, at *6. The issue concerning whether Forrest would be entitled to recover its overhead or profit, was moot by our holding that Forrest failed to demonstrate its actual costs.

QUANTUM MERUIT

Mrs. Laughlin was an owner on the home Forrest Construction substantially built, and she obviously benefitted from the work performed by Forrest Construction; however, she was not a party to the contract. Therefore, Forrest had no basis upon which to pursue a breach of contract claim against her, but it did have grounds upon which to file a claim for unjust enrichment based on the doctrine of quantum meruit for which the trial court awarded Forrest a judgment of $113,267.59 against Mrs. Laughlin.

"Quantum meruit actions are equitable substitutes for contract claims." *Castelli v. Lien*, 910 S.W.2d 420, 427 (Tenn. Ct. App. 1995). A party who has provided goods and services to another may recover the reasonable value of these goods and services when the following five circumstances exist:

> (1) there must be no existing, enforceable contract between the parties covering the same subject matter,
>
> (2) the party seeking recovery must prove that it provided valuable goods and services,
>
> (3) the party to be charged must have received the goods and services,
>
> (4) the circumstances must indicate that the parties involved in the transaction should have reasonably understood that the person providing the goods or services expected to be compensated, and
>
> (5) the circumstances must also demonstrate that it would be unjust for the party benefitting from the goods or services to retain them without paying for them.

*Id.* (internal citations omitted).

One's entitlement to a recovery under quantum meruit is limited to the *value* of the goods or services, and *not their contract price*. *Castelli*, 910 S.W.2d at 427-38 (citing *Lawler v. Zapletal*, 679 S.W.2d 950, 955 (Tenn. Ct. App. 1984), *Warren Bros. Co. v. Metropolitan Gov't*, 540 S.W.2d 243, 247 (Tenn. Ct. App.1976); *Cooksey v. Shanks*, 136 S.W.2d 57, 58-59 (Tenn. Ct. App. 1939)). "The measure of compensation for unjust enrichment is based on the reasonable value of the services 'to be judged by the customs and practices prevailing in that kind of business.'" *Lawler*, 679 S.W.2d at 955 (quoting *Chisholm v. Western Reserves Oil Co.*, 655 F.2d 94, 96 (6th Cir.1981)). Thus, courts may not make such an award without "some proof of the reasonable *value* of the goods or services. . . ." *Castelli,* 910 S.W.2d at 428 (citing *Bokor v. Holder*, 722 S.W.2d 676, 680-81 (Tenn. Ct. App. 1986); *Sadler v. Middle Tenn. Elec. Membership Corp.*, 259 S.W.2d 544, 547 (Tenn. Ct. App. 1952)) (emphasis added). The proof does not have to be exact, it may be "an estimation of the value of the goods and services." *Id.* (citing *Adams v. Underwood*, 470 S.W.2d 180, 184 (Tenn. 1971)).

The burden was upon Forrest Construction to prove that it is entitled to a judgment for services rendered on the basis of quantum meruit. *See Bokor*, 722 S.W.2d at 680. Forrest Construction failed to prove the value of the goods and services it provided, which is the value of its services according to the customs and practices prevailing in home construction industry. *See Lawler*, 679 S.W.2d at 955 (citing *Chisholm*, 655 F.2d at 96). "Without proof of damages, there can be no award of damages." *Bokor*, 722 S.W.2d at 681 (quoting *Inman v. Union Planters National Bank*, 634 S.W.2d 270, 272 (Tenn. Ct. App. 1982)).

In this case, the trial court erroneously awarded Forrest Construction the *costs* it claimed it incurred, not the value of the goods and services it provided. Thus, Forrest Construction is not entitled to recover against Mrs. Laughlin based upon quantum meruit.

There is another reason Forrest Construction is not entitled to a recovery based upon quantum meruit. *See Paschall's Inc. v. Dozier*, 407 S.W.2d 150, 155 (Tenn. 1966). As the Supreme Court explained in *Paschall's*, if the plaintiff had a contract with a third party, "before recovery can be had against the landowner on an unjust enrichment theory, the furnisher of the materials and labor must have exhausted his remedies against the person with whom he had contracted, *and still has not received the reasonable value of his services*." *Id.* (emphasis added). In this case, Forrest has exhausted its remedies against the person with whom it contracted – James Laughlin – and we determined that it was not entitled to an award above what was paid by Mr. Laughlin and Forrest has failed to establish that it still has not received the reasonable value of his services.

For these reasons, we reverse the trial court's award to Forrest Construction under the theory of quantum meruit.

### NEGLIGENT CONSTRUCTION

Both parties appeal certain aspects of the trial court's award of damages to the Laughlins as a consequence of Forrest's negligent construction. Forrest Construction contends the trial court erred in awarding the Laughlins damages for negligent construction on several grounds. It contends that the Laughlins are not entitled to damages because they committed the first material breach of the contract, which issue was rendered moot by our finding that the Laughlins did not breach the contract. Forrest Construction also contends that the Laughlins are barred from recovery for the damages because they did not give Forrest Construction notice of the defects and the opportunity to cure them, and further contends that the trial court erred in finding that the Laughlins were excused from the duty to give notice and an opportunity to cure. The Laughlins appeal the amount of the award. We will address the issue of notice and opportunity to cure first.

#### NOTICE AND OPPORTUNITY TO CURE

The trial court found that the Laughlins incurred damages due to the "defective and negligent work performed by Forrest Construction." Forrest Construction does not challenge the trial court's finding that negligent construction occurred, but argues that the trial court erred in awarding any

damages to the Laughlins for negligent construction because it was not given notice of the alleged defects, nor was it afforded the opportunity to cure any alleged defects.

As a general rule, a party alleging defects in the performance of a contract is required to give notice and a reasonable opportunity to cure the defects. *Carter v. Krueguer*, 916 S.W.2d 932, 935 (Tenn. Ct. App. 1995). This is to "allow the defaulting party the opportunity 'to repair the defective work, to reduce the damages, to avoid additional defective performance, and to promote the informal settlement of disputes.'" *Custom Built Homes*, 2006 WL 3613583, at *5 (quoting *Carter*, 916 S.W.2d at 935). There are, however, circumstances in which this duty to give notice and an opportunity to cure is excused.

In *Custom Built Homes*, this court found that the homeowners were excused from the requirement of giving the contractor notice and an opportunity to cure the alleged defects because the contractor was found to have abandoned the job site and the contract. *Custom Built*, 2006 WL 3613583, at *5 (citing *Brady v. Oliver*, 147 S.W. 1135, 1138 (Tenn. 1911) (holding that where one party to a contract announces in advance his intention not to perform, the other party may treat the contract as broken, and sue at once for the breach)).

In another example, *Eastbourne v. Brumitte*, No. E2002-00068-COA-R3-CV, 2003 WL 1233628 (Tenn. Ct. App. 2003), which the trial court relied upon in excusing the Laughlins from the duty, this court also excused the homeowners from the requirement to give notice of the defects to their contractor. We based this decision upon the determination that "[the contractor] materially failed to perform his contractual obligations and, accordingly, to the extent they did not do so, the [homeowners] were excused from the duty to give notice and opportunity to correct" the defects. *Id*. at *3. The material failure that the court found was defects that were brought to his attention, which he then failed to acknowledge or correct. *Id*. at *5 ("It is our determination that [contractor] had adequate opportunity to repair the brickwork prior to [homeowner's] instructions, but would not concede that the extent of the work necessary to remedy the problem was, in fact, necessary."). Looking to the factors in *Eastbourne*, the trial court found that it was extremely unlikely that Forrest Construction would have corrected the defects in the home considering the defects were not discovered until after the lawsuit had been filed.

Forrest Construction argues, however, that the exclusive fact that the defects were repaired or discovered following the commencement of the litigation should not excuse the Laughlins from their duty to give notice, and cites to the case of *Lavy v. Carroll*, No. M2006-00805-COA-R3-CV, 2007 WL 4553016 (Tenn. Ct. App. Dec. 26, 2007), for the proposition that the filing of a lien does not effect a party's requirement to give notice and an opportunity to cure. We believe that *Lavy* is distinguishable, and agree with the trial court that the Laughlins were excused from the requirement to give notice and an opportunity to cure the repaired defects on their home. In *Lavy*, we found that "[f]ilings under lien law would have no effect on [the] duty to first give the contractor notice of the claimed defects and then allow him a reasonable opportunity to cure." In that case, the record demonstrated that the contractor had not been notified of any problems with his work, did not ever refuse to address any of the issues that had been brought to his attention, and that after requesting

final payment, the homeowner's agents prevented the contractor from reentering the property. *Id*. at *3. The homeowner simply argued that the filing of a lien statement excused her duty from the duty to give notice. We find this case distinguishable, however, as in this action, we have not just the filing of a lien, but also a lawsuit for breach of contract, which pre-dated the discovery of the defects. Additionally, in *Lavy*, the homeowners prevented the contractor from reentering the property. In this case, by the time the defects were discovered, Forrest Construction had already abandoned the job site.

We also find the case of *Salley v. Pickney Co.*, 852 S.W.2d 240 (Tenn. Ct. App. 1992) supports the finding that the Laughlins were excused from the duty to mitigate. In *Salley v. Pickney*, we reversed the trial court's dismissal of the homeowners' claim due to their failure to give notice to the contractors in order to mitigate their damages. *Id*. We noted that the duty to mitigate exists in order to "to put the injured party in as good as a position as he would have occupied had complete performance been rendered by the defaulting party at the least necessary cost. *Id*. at 244. We then noted that the duty to mitigate contains a "reasonableness" standard:

> [t]he critical factor in determining fulfillment of a plaintiff's duty to mitigate is whether the method which he employed to avoid consequential injury was reasonable under the circumstances existing at the time. The rule with respect to the mitigation of damages may not be invoked by a contract breaker "as a basis for hypercritical examination of the conduct of the injured party, or merely for the purpose of showing that the injured person might have taken steps which seemed wiser or would have been more advantageous to the defaulter. As stated in McCormack, Damages, Sec. 35 (1935), "a wide latitude of discretion must be allowed to the person who by another's wrong has been forced into a predicament where he is faced with a probability of injury or loss. Only the conduct of a reasonable man is required of him."

*Id*. (citing *Action Ads, Inc. v. William B. Tanner Co.*, 592 S.W.2d 572 (Tenn. Ct. App. 1979) (quoting *Tampa Electric Co. v. Nashville Coal Co.*, 214 F. Supp. 647, 652 (M.D. Tenn. 1963)). We then held that the homeowners acted reasonably in refusing to allow the contractors to come back and work on their home as "the record [was] replete with evidence of the defects in the Contractors' work." *Id*. As in this case, "[t]he plaintiffs' expert testimony showed that the cumulative effect of the defects caused by the Contractor rendered the Contractors' performance unworkmanlike, thereby constituting a breach of contract." *Id*.

Similarly, in the case of *Vaccaro Construction Co., Inc. v. Schafer*, No. W2003-02515-COA-R3-CV, 2004 WL 2439297 (Tenn. Ct. App. June 24, 2004), we found that the homeowners were excused from the duty to give the contractor notice and an opportunity to cure stating:

> [w]here reasonable, this can include giving the party in breach of the contract notice of the claimed defects and an opportunity to cure. Where, however, the defects are extensive and the contractor's overall performance must be deemed unworkmanlike,

the injured party may reasonably refuse to risk further injury by giving the contractor the opportunity to attempt to repair the defects.

*Vaccaro*, 2004 WL 2439297, at *6 (citing *Salley*, 852 S.W.2d at 244).

We believe that the cases of *Custom Built*, *Eastbourne*, *Salley*, and *Vaccaro* support the finding that Forrest Construction's material breach of the contract by failing to adhere to the contract's terms, and the substantial number of defects in the construction excused the Laughlins from the requirement to give notice and an opportunity to cure. While Forrest Construction seems to argue that the duty to give notice and an opportunity to cure is an unyielding requirement, the aforementioned cases indicate that the surrounding circumstances must be taken into account to determine what was reasonable under the circumstances. The Laughlins sought damages only for the defects that they discovered *after* moving into the residence in January of 2005.[17] By this time, Forrest Construction had materially breached the contract by abandoning the job site, and did not return the phone call of Mr. Laughlin regarding this abandonment. Therefore, we affirm the trial court's ruling that the Laughlins were excused from the requirement to give notice and an opportunity to cure the alleged defects.

### DAMAGES AWARDED FOR NEGLIGENT CONSTRUCTION

As previously stated, the trial court found that the Laughlins incurred damages to their residence due to the defective and negligent work of Forrest Construction. The trial court awarded the Laughlins a judgment of $74,000 for damages resulting from the negligent construction on their home by Forrest Construction. Specifically, these damages were to repair the construction of the exterior patio on the home. On appeal, the Laughlins contend that the evidence preponderated against the trial court's award of only $74,000, instead of $223,562.50, which their expert witness, Charles Atkinson, testified would be the cost to repair the exterior patio.

There are two key components to their contention. First, they argue that the trial court erred by substantially reducing their expert witnesses' estimate of the cost to repair the unrepaired defects, specifically, the cost to repair the foundation wall and exterior patio, which Mr. Atkinson testified would cost $168,562.50. Second, they contend that the trial court failed to address the cost for grout-filling the foundation wall, which Mr. Atkinson testified would cost an additional $55,000.

The trial court divided the defects to the Laughlins' residence into two categories. One is the defects that were repaired by the Laughlins' new contractor, Charles Atkinson; the other category is the defects that were identified, but had not been repaired at the time of trial.

As for the defects that had been repaired, they included repairs to the master shower from water infiltration, replacement of the upstairs front porch, and repairs to the front doors of the

---

[17]The Laughlins did not seek any damages for the cost of completion of the home.

residence. Other repairs included replacement of broken mirrors and missing door parts, repairing the irrigation system, replacing brick columns on the driveway, and repairing the HVAC system.[18] The trial court awarded the Laughlins a judgment of $51,637.52, which was the amount charged by Mr. Atkinson to make these repairs. The Laughlins do not contest this award.

As for the defects that had not been repaired as of trial, they included the construction of the outside patio, which consisted of three exterior walls and one interior foundation wall, of which the foundation wall was not grouted as required by building codes, the patio walls were not connected to the base of the patio floor for support, and the exterior walls did not have vertical steel in them. The proof at trial established that, due to these defects, cracks were already present in the patio and further deterioration was expected. The trial court found that the construction of the foundation and patio walls was not in accordance with acceptable engineering practice, or the requirements and recommendations of the Brentwood Building Code and the International Residential Code and the conditions will continue to deteriorate as a result of Forrest Construction's negligent work. The court also found that "a noticeable gap has developed at the southwest corner" of the Laughlins' residence "where the foundation wall meets the southern patio wall," "the gap has continued to widen due to the forces of the backfill inside the patio walls," "the drywall inside the home above this corner has begun to crack," and "the three exterior patio walls have no vertical steel in them, which is needed to accommodate the eight feet of backfill, which the Court finds produces a force of 30 pounds per square foot, per foot of depth."

The trial court went on to adopt the recommendations by the Laughlins' witness, Mr. Buchanan, regarding the repairs required to make the Laughlins whole. Specifically, the trial court found that

> the foundation wall will have to be grout-filled. The pavers will have to be removed from the patio. The three exterior patio walls, including the stairs, will have to be demolished, and the patio walls will then be reconstructed using rebar as outlined in Mr. Buchanan's report. Finally, the patio walls should be tied into a four-inch concrete slab forming the base of the patio floor.

After making the above findings, the trial court then directed its attention to Mr. Atkinson's estimate of the cost of performing the above repairs. Mr. Atkinson estimated the cost of these repairs would be $168,562.50. The trial court chose not to award the Laughlins this amount, however, stating that it:

> finds that figure [$168,562.50] is not reasonable. Mr. Atkinson is reluctant to embark upon these additional repairs, and as a result, has greatly inflated his estimate. As a result, the Court awards the Laughlins $74,000 as a reasonable amount to compensate them for the repairs to their patio and foundation wall.

---

[18]The Laughlins also paid a privilege tax on the bonus room above their garage, which had not been paid by Forrest Construction when constructed.

-19-

The Laughlins argue that this reduction of their damages for the repairs was in error. Damages for breach of contract may be awarded even where it is impossible to prove the exact amount of damages. *Moore Const. Co., Inc. v. Clarksville Dept. of Electricity*, 707 S.W.2d 1,15 (Tenn. Ct. App. 1985) (citing *Provident Life and Accident Insurance Co. v. Globe Indemnity Co.*, 3 S.W.2d 1057, 1058 (Tenn. 1928)). All that is required is proof with a reasonable degree of certainty. *Id.* (citing *Buice v. Scruggs Equipment Co.*, 267 S.W.2d 119, 125-26 (Tenn. 1953)).

The burden was on the Laughlins to demonstrate their damages, i.e., the reasonable cost of the required repairs, which is the measure of damages for defects in a construction contract. *GSB Contractors v. Hess*, 179 S.W. 3d 535, 543 (Tenn. Ct. App. 2005). The Laughlins presented the testimony of two expert witnesses, Mr. Atkinson and Mr. Buchanan, regarding the required repairs and their costs. Forrest Construction put on no witnesses to challenge the cost of the repairs, adhering exclusively to the contention that the construction was not negligent and did not require repair.

The trial judge, as the trier of fact, is not compelled to unequivocally accept expert opinions. *Davis v. Sliney*, 1988 WL 75331, at *5 (July 21, 1998) (citing *Cocke County Bd. of Highway Comm'rs v. Newport Utilities Bd.*, 690 S.W.2d 231, 237 (Tenn. 1985)). The weight, faith, and credit to be given to any witness's testimony lies in the first instance with the trier of fact, and the credibility accorded will be given great weight by the appellate court. *Id.* (citing *Sisk v. Valley Forge Ins. Co.*, 640 S.W.2d 844 (Tenn. Ct. App. 1982)); *see also In re Estate of Walton v. Young*, 950 S.W.2d 956, 959 (Tenn. 1997); *Whitaker v. Whitaker*, 957 S.W.2d 834, 837 (Tenn. Ct. App. 1997)).

Based upon the foregoing deferential standard, we will defer to the trial court concerning the weight to be given to Mr. Jackson's "$168,562.50" estimate. However, we are troubled by the trial court's ruling, as the testimony of Mr. Atkinson was that the total cost for the needed repairs was $223,562.50, and not $168,562.50 as the trial court stated. It appears the trial court failed to consider the separately itemized cost for "grout-filling the foundation wall," which was $55,000. Mr. Buchanan testified this repair was needed and the trial court made an express and specific finding that this needed to be done. Thus, the total estimate of the cost of the repairs the trial court found were necessary was $223,562.50. We also find it significant that Forrest Construction presented no such evidence regarding the cost of the repairs the trial court found were needed; it only challenged the need for repairs, not the cost. Accordingly, the only evidence introduced regarding the cost to make the needed repairs was that presented by the Laughlins' expert. Nevertheless, the trial court awarded only $74,000 without stating how it arrived at that figure.

We are unable to determine whether the trial court considered or overlooked the additional cost of $55,000 when it decided to reduce the estimated cost of the needed repairs to $74,000. Because of the significance of the amount the trial court may have overlooked, the fact the court may have erroneously believed the total estimate was only $168,562.50, instead of $223,562.50, and the fact that we are unable to ascertain how the trial court determined the award should be $74,000, we find it necessary to remand this issue to the trial court so that the trial court may examine the evidence presented at the trial of this case and remove this uncertainty by either ratifying its previous

-20-

ruling of $74,000 or increasing the award of damages caused by Forrest Construction's negligent construction in the amount it deems appropriate.[19]

## PIERCING THE CORPORATE VEIL

Lastly, the Laughlins argue that the trial court erred in not piercing the corporate veil to reach the funds of Thomas Naive, the owner and sole member of Forrest Construction, LLC. The trial court did not reach the determination of piercing the corporate veil finding that the issue was moot based upon its award to Forrest Construction for its breach of contract claim. As the trial court made no findings regarding this, we remand to the trial court for further proceedings on the issue.

## DISCRETIONARY COSTS

The trial court awarded Forrest Construction discretionary costs in the amount of $1,719.50. We have determined that Forrest Construction is not entitled to recover any damages against either defendant. Thus, it is not a prevailing party on any issue.

The costs included in the bill of costs prepared by the clerk shall be allowed to the prevailing party, unless the court otherwise directs. *See* Tenn. R. Civ. P. 54.04(1). Rule 54 further provides that the trial court has the discretion to award additional costs, "costs not included in the bill of costs prepared by the clerk." The Rule further provides:

> In the event an appeal results in the final disposition of the case, under which there is a different prevailing party than the prevailing party under the trial court's judgment, the new prevailing party may request discretionary costs by filing a motion in the trial court, which motion shall be filed and served within thirty (30) days after filing of the appellate court's mandate in the trial court pursuant to Rule 43(a), Tenn. R. App. P.

Tenn. R. Civ. P. 54.04(2).

At the conclusion of the trial, the trial court correctly determined that each party prevailed on certain claims and that each was entitled to recover some of the costs not included in the bill of costs prepared by the Clerk. As a consequence of our determination, Forrest Construction is no longer a prevailing party; thus, it is not entitled to recover any costs based upon Tenn. R. Civ. P. 54.04(2). We, therefore, reverse the award of discretionary costs to Forrest Construction.

---

[19] We are not remanding this issue for the introduction of additional evidence or for a new trial. The parties were afforded the opportunity to present all relevant evidence at the trial of this case and they are not entitled to a second bite at the apple. Thus, on remand, the trial court should limit its review to the evidence presented at the trial of this case.

**IN CONCLUSION**

We have determined that James Laughlin and Debbie Laughlin are entitled to recover damages incurred as a result of negligent construction by Forrest Construction, and have remanded to the trial court for a confirmation of its award or a revision of that award. We have also determined that Forrest Construction is not entitled to any damages against James Laughlin for breach of contract, that Forrest Construction is not entitled to any recovery against Debbie Laughlin based upon the doctrine of quantum meruit, and that Forrest Construction is not entitled to recover discretionary costs. Therefore, the respective judgments for each of these awards are reversed. As for the Laughlins' claim to pierce the corporate veil in an attempt to hold Thomas Naive personally liable for the damages owed by Forrest Construction, we have remanded that issue for the trial court to determine. The trial court may afford the parties an opportunity to introduce evidence pertinent to that issue if the trial court deems that appropriate.

Therefore, the judgment of the trial court is reversed in part, affirmed in part, and remanded for further proceedings in accordance with and as necessitated by this decision. Costs of appeal are assessed against Forrest Construction Company, LLC.

_____
FRANK G. CLEMENT, JR., JUDGE