IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
Submitted on Briefs January 8, 2014

# MOUNTAIN WOOD PRODUCTS, LLC
## v.
# AUTUMN CREEK FIREWOOD, LLC

**Appeal from the Chancery Court of Bledsoe County**
No. 3163    Jeffrey F. Stewart, Chancellor

---

**No. E2013-01577-COA-R3-CV-FILED-MAY 30, 2014**

---

This appeal involves a contract dispute.  The appellant distributor challenges the damages awarded to the appellee supplier under a supply contract for bagged firewood.  Additionally, the supplier challenges the trial court's failure to award damages for lost profits and tortious interference with prospective business.  Discerning no error, we affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court is Affirmed**.

HOLLY M. KIRBY, J., delivered the opinion of the Court, in which ALAN E. HIGHERS, P.J. W.S., and J. STEVEN STAFFORD, J., joined.

Samuel J. Gowin, Chattanooga, Tennessee, and Clark E. Gulley, Colbert, Georgia, for Plaintiff/Appellant Mountain Wood Products, LLC

W.I. Howell Acuff, Cookeville, Tennessee, for Defendant/Appellee Autumn Creek Firewood, LLC

# MEMORANDUM OPINION[1]

## FACTS AND PROCEEDINGS BELOW

The facts in this case are generally undisputed. Plaintiff/Appellant Mountain Wood Products, LLC ("Mountain Wood") is a limited liability company engaged in the business of producing and distributing bagged firewood. Mountain Wood's firewood was sold at big box retailers such as Publix, Kroger, Home Depot, and Winn-Dixie for over 13 years. Defendant/Appellee Autumn Creek Firewood, LLC ("Autumn Creek") is a limited liability corporation formed in February 2010. In June 2010, Autumn Creek was interested in getting into the business of providing bagged firewood, so Autumn Creek approached Mountain Wood for the purpose of establishing a business relationship. Pursuant to Autumn Creek's initial contact, on August 10, 2010, the owner of Autumn Creek, Mr. Josh Crace, and the principal owner of Mountain Wood, Mr. David Creely, executed a supply contract ("Supply Contract") for Autumn Creek to supply firewood to Mountain Wood. The 17-page Supply Contract was prepared by Mountain Wood without the assistance of an attorney.

The Supply Contract stated that the "Term of Agreement" for the contract "shall be for the 2010-2011 Retail Firewood Season beginning on the date stated above until midnight on the 31st day of March, 2011." Under the Supply Contract, Mountain Wood "agree[d] to purchase from [Autumn Creek] 150,000 .75 cubic feet bags of firewood," at $2.50 per bag, less a 7% commission and less $0.23 for the cost of the bag, for a total of $2.10 per bag. The Supply Contract did not expressly address whether Autumn Creek was required to use Mountain Wood's bags. The Supply Contract called for Mountain Wood to pay 30 days after receiving an invoice from Autumn Creek. The only performance requirements listed in the Supply Contract described how the bags and pallets were to be sized and packed for delivery. The Supply Contract also contained the following provision on damages:

> 11. Damages: In the event of any disruption or delay in the bagging of
> firewood ordered by [Mountain Wood] for Designated Retailer or for any
> [Mountain Wood] location resulting in delayed or rejected orders, [Autumn

---

[1]**Rule 10. Memorandum Opinion**

> This Court, with the concurrence of all judges participating in the case, may affirm, reverse
> or modify the actions of the trial court by memorandum opinion when a formal opinion
> would have no precedential value. When a case is decided by memorandum opinion it shall
> be designated "MEMORANDUM OPINION", shall not be published, and shall not be cited
> or relied on for any reason in any unrelated case.

Tenn. Ct. App. R. 10.

Creek] shall be liable for all costs resulting from such delay or disruption. If delay, disruption, or damage occurs during transit . . . [Autumn Creek] will not be held liable for costs incurred. In the event of breach of this Supply Contract, [Autumn Creek] may be held liable only for the reasonable increased cost of bagged firewood required to cover the contractual volume until the ending date of this Supply Contract.

The Supply Contract did not include a delivery schedule. However, the record indicates that the parties apparently agreed orally that Autumn Creek's firewood shipments to Mountain Wood would begin in early September 2010. The record also indicates that both parties expected relatively steady demand for product throughout the firewood season.

After the parties entered into the Supply Contract, Mountain Wood experienced some internal confusion and staffing issues. As a result, Mountain Wood did not place its first firewood order with Autumn Creek until late September 2010. Autumn Creek's physical facility was small, and soon after Mountain Wood placed its first firewood order, Autumn Creek began experiencing "production bottlenecks" in producing the bagged firewood.

After this rocky start, Mountain Wood began steadily placing orders with Autumn Creek. As retailers placed orders with Mountain Wood, Mountain Wood gave Autumn Creek the first option to ship it the firewood needed for the retailers' orders. However, it is undisputed that Mountain Wood also had firewood supply contracts with several other suppliers. In general, when Mountain Wood placed a firewood order with Autumn Creek, Autumn Creek would inform Mountain Wood's dispatcher how much of the order it would be able to fill, and would also give the dispatcher an estimate of when Autumn Creek would be able to fulfill the remainder of Mountain Wood's order. If Mountain Wood needed more wood than Autumn Creek could timely supply to meet the demands of Mountain Wood's customers, Mountain Wood would order the balance of the needed firewood from other suppliers, including a supplier called Cowboy Charcoal. This pattern continued throughout fall and winter of 2010.

At some point during the 2010-2011 firewood season, difficulties arose regarding the lack of Mountain Wood bags provided to Autumn Creek. Autumn Creek said it was under the impression that all of the firewood to be sent to Mountain Wood had to be bagged in Mountain Wood's "Fresh Pack" bags, and Autumn Creek indicated that Mountain Wood did not provide them with the number of bags needed. At some point, Mountain Wood gave Autumn Creek permission to heat-shrink the firewood instead of bagging it, but this directive strained Autumn Creek's production capacity as well.

Over the course of the 2010-2011 firewood season, Autumn Creek sent Mountain Wood 49 invoices for firewood supplied. Mountain Wood paid 5 of the 49 invoices within the 30 days set forth in the parties' Supply Contract, and paid 28 of the invoices after the 30-day period. Mountain Wood failed to pay 16 of the invoices, a total of $45,165. Mountain Wood's failure to timely pay the invoiced amounts placed financial strain on Autumn Creek.

Toward the end of the firewood season, a complaint surfaced that a shipment of firewood that originated with Autumn Creek contained moldy wood. Autumn Creek apparently took back the returned bundles of firewood. Autumn Creek claimed that it issued Mountain Wood a credit for approximately $3,000 in accordance with the damages clause in the Supply Contract, quoted above.

Concerned about Autumn Creek's ability to fill its firewood orders, Mountain Wood entered into a contract with another firewood supplier, Dixie Wood Products. Even after Mountain Wood entered into the Dixie Wood Products supply contract, the same issues between Mountain Wood and Autumn Creek persisted.

In February 2011, Autumn Creek sent Mountain Wood a request for more firewood bags. Shortly after that, on February 14, 2011, Mountain Wood sent Autumn Creek an email indicating that Mountain Wood did not plan to place any more firewood orders with Autumn Creek. In reply to Autumn Creek's request for clarification, Mountain Wood informed Autumn Creek that it was terminating the Supply Contract, citing Autumn Creek's performance issues, including the moldy wood. By that time, Autumn Creek had supplied Mountain Wood approximately 68,750 of the 150,000 bags of firewood referenced in the Supply Contract.[2]

When Mountain Wood informed Autumn Creek it would place no more firewood orders, Autumn Creek stopped producing firewood because it felt that it would be unable to sell it. However, at the time Autumn Creek received the termination notice from Mountain Wood, Autumn Creek already had on hand approximately 10,800 bundles of palleted and bagged firewood ready to be shipped. In order to salvage some compensation for the firewood it had on hand, Autumn Creek disassembled the pallets and sold the firewood as ricked wood for approximately $12,000.

---

[2]There was some dispute in the trial testimony over the number of bundles of firewood Autumn Creek supplied. In its oral ruling, the trial court recited figures that indicated which witness's testimony it credited. We are required on appeal to defer to the trial court's assessment of the witnesses' credibility, so we recite in the facts the figure utilized by the trial court.

On June 23, 2011, Mountain Wood filed this breach-of-contract lawsuit in the Chancery Court of Bledsoe County. The lawsuit sought damages in the amount of $35,373.50 for increased firewood costs and freight charges Mountain Wood claimed it incurred as a result of Autumn Creek's repeated failure to deliver the quantity of bagged firewood Mountain Wood ordered within the time period requested. Mountain Wood acknowledged that it owed Autumn Creek $37,155 as payment for outstanding invoices, but it sought "to setoff monies due as damages for breach of contract from monies owed" to Autumn Creek. After the setoff, Mountain Wood claimed, it owed Autumn Creek only $1,781.50.

In August 2011, in response to Mountain Wood's complaint, Autumn Creek filed an answer and a counterclaim. Autumn Creek's counterclaim cited many alleged prior breaches by Mountain Wood, including failure to adequately supply firewood bags, failure to pay invoices, refusal to take firewood in early September 2010, and refusal to place additional orders after mid-February 2011. Autumn Creek alleged that Mountain Wood and its principal owner David Creely were aware of the financial strain its failure to pay invoices placed on Autumn Creek. Based on this allegation, Autumn Creek's counterclaim also asserted other causes of action including conspiracy, fraud, and tortious interference with prospective business. Discovery ensued.

Eventually, the trial court granted summary judgment in favor of Mountain Wood on all of Autumn Creek's claims of fraud and conspiracy, as well as all claims against David Creely individually.[3] The trial court permitted Autumn Creek's claims for breach of contract and tortious interference with prospective business to proceed, along with Mountain Wood's breach of contract claim.

The trial court conducted the trial in November 2012. The trial court heard testimony from several witnesses who were representatives of both parties. Mr. Creely did not testify.

The owner of Autumn Creek, Mr. Josh Crace, testified at the outset of the trial. Mr. Crace described his initial interactions with Mountain Wood and the negotiations that led to the execution of the parties' Supply Contract. He acknowledged that, while he had an expectation that Mountain Wood would place firewood orders throughout the firewood season, the Supply Contract did not include a shipping schedule. Mr. Crace said, however, that Mountain Wood representatives saw Autumn Creek's small storage facility. Given Mountain Wood's knowledge of these space limitations, Mr. Crace maintained that Mountain Wood had to know that it was important for Mountain Wood to take firewood from Autumn Creek at the beginning of the firewood season, so that Autumn Creek could empty its storage

---

[3] The trial court heard the parties' respective summary judgment motions in October 2012; however, the trial court's order on these motions was not entered until August 2013, nunc pro tunc to October 29, 2012.

space to make room for the firewood for future orders. Mr. Crace said that, when he signed the Supply Contract, he expected that he would not have to deliver all the wood Mountain Wood requested when they requested it, only that shipments would take place periodically throughout firewood season and the last shipment would occur on March 31st.

Mr. Crace acknowledged that Autumn Creek was unable to fill all of Mountain Wood's requests. He cited various reasons for the inability to do so, including packing problems, employee resignations, weather conditions, and lack of bags.

Mr. Crace explained that, when he received the February 2011 email from a Mountain Wood employee stating that Mountain Wood was "done," he tried to call Mr. Creely with Mountain Wood but could not reach him. At that point, Autumn Creek stopped producing firewood because Mr. Crace did not think they would be able to sell what they had on hand. Autumn Creek ended up selling its remaining firewood by the rick for $12,000. Mr. Crace testified that, had Mountain Wood purchased this firewood as Autumn Creek expected, Autumn Creek would have received approximately $30,000 for it.

Asked if Autumn Creek would have been able to fulfill the remainder of the Supply Contract had Mountain Wood not terminated it, Mr. Crace responded:

> If it had come February 14th and [Mountain Wood] said, we want all that wood, I'd give you assurances we're going to buy all that wood. There's no way I could have produced 70,000 bundles myself from February 14th to March 31st, but I would have went to Cowboy Charcoal and I'd have got that wood and I'd have sold it to you and I would have met my contract. . . . I absolutely could have fulfilled this contract.

Mr. Crace claimed he would have rented additional storage space and hired a transfer company to move Autumn Creek's finished firewood so that he could produce more, and in addition he would have purchased from Cowboy Charcoal whatever firewood he could not produce.

Mr. Crace testified that, in the firewood industry, major retailers begin placing orders for the next year in February, March, and April. He claimed that Autumn Creek would have been a strong candidate for a contract in 2011 with Publix, one of Mountain Wood's biggest customers, had Mountain Wood complied with the Supply Contract. Instead, Mountain Wood's failure to timely pay invoices created financial issues for Autumn Creek that left it in a poor position to pursue the Publix business. Mr. Crace acknowledged, however, that Publix had a stronger relationship with Mountain Wood than with Autumn Creek.

-6-

Mountain Wood employee Courtney Nichols testified that Mountain Wood sold 890,700 bundles of firewood to various retailers during the 2010-2011 firewood season. She said that Autumn Creek provided 68,750 of that total number of bundles of firewood. Ms. Nichols explained that often the firewood Mountain Wood obtained from Cowboy Charcoal was cheaper than the firewood it obtained from Autumn Creek, but the shipping and freight costs for the Cowboy Charcoal firewood were higher, so overall Mountain Wood made less money when it had to secure its firewood from Cowboy Charcoal. Ms. Nichols testified that, because Mountain Wood had to cover for the firewood Autumn Creek was unable to supply, Mountain Wood suffered damages in the amount of $36,396.

The trial court also heard testimony from Chelli Winkler, one of the owners of Mountain Wood and its vice president of operations. At the beginning of the 2010-2011 firewood season, Ms. Winkler said, she anticipated that Mountain Wood would sell "[a] million, little over a million" in firewood that season. She was unaware of any conversation with Mr. Crace concerning a schedule for deliveries or a pattern of orders from retailers during the firewood season. She explained that Mountain Wood does not "get a choice when we deliver. When the retailer asks for [an order of firewood], we have to give it to them. . . [o]r we lose them . . . . Basically, they fire us." After she and Mr. Creely visited Autumn Creek's facilities, Ms. Winkler said, they were concerned that Autumn Creek "wasn't going to be able to keep– you know to produce it" and "that he didn't have enough storage and all that." Because of that concern, Mountain Wood contracted with Cowboy Charcoal as an additional supplier. Later in the season, Mountain Wood contracted with Dixie Wood Products to meet their customers' demand. Ms. Winkler estimated that the contract with Cowboy Charcoal was for 250,000 bags of firewood.[4]

At the conclusion of the testimony, the trial court issued an oral ruling. The trial court first noted that Mountain Wood had inspected Autumn Creek's facilities and acknowledged having concerns about Autumn Creek's capacity to produce, store, and provide the quantity of goods that were requested. Because of these concerns, in addition to contracting with Autumn Creek, Mountain Wood contracted with Cowboy Charcoal to supply wood during the 2010-2011 firewood season and then "[l]ater in the firewood season . . . [to buy] from Dixie Firewood [sic]." The trial court observed that the parties had different expectations about how orders would be placed. Mr. Crace testified that he expected orders to come in steadily and that Autumn Creek would have time to fill them, but Mountain Wood instead tended to place orders in bunches for immediate delivery. The trial court commented that this was likely "why timeliness was not specified in the contract." The trial court then made the following findings of fact and conclusions of law:

---

[4]The record does not include a figure to Dixie Wood Products.

The Court finds from the evidence in favor of the defendant on the plaintiff's breach of contract claim. The issue of timeliness and delay are not clearly spelled out. The contract calls for the defendant to furnish the plaintiff a hundred and fifty thousand bags of seasoned firewood between August 1st, 2010, and March 31st, 2011. The defendant had 10,800 bags of firewood on hand in February of 2011 when the plaintiff stopped ordering. The defendant stopped producing because the plaintiff stopped ordering.

The Court finds the plaintiff was to provide the bags to be used for bagging and clearly they failed to do this, which caused delays in the defendant's production of bagged firewood. I further find the plaintiff was contractually obligated to buy 250,000 bags of firewood from Cowboy Charcoal and the purchases argued as cover were not covered but by contract. They only purchased 201,000 of the 250,000 contracted. This is true for Dixie Firewood purchases, as well.

Plaintiff was aware from the beginning that the defendant may not be able to produce after inspecting their facilities and considering it was their first year of operation. Further, the plaintiff anticipated sales of on[e] million bags to be sold, but in fact, sold 890,000, and they met all deliver[ie]s on sales and I find they were not damaged.

The defendant has prevailed upon its counter-claim for unpaid invoices. The testimony of Josh Crace from the Bates stamped invoices shows $42,165 in unpaid invoices. The defendant had 10,800 bags of firewood on site at a price of $2.10 per bag that the plaintiff did not pick up. The plaintiff owes $22,680 less $12,000 the plaintiff received for selling this by the rick, or an additional $10,680 in damages.

The defendant is not entitled to lost profits. The testimony on lost profits was too speculative. The defendant has failed to carry its burden of proof on the counter-claim for intentional interference with prospective business relationships. The defendant has failed to show the plaintiff formed the requisite intent to interfere. Dispute between the parties appears to be over damages and offsets to damages. The Court finds there was only one contract and not a second or oral contract for the kiln-dried firewood.

I award the defendant prejudgment interest at the statutory rate for the unpaid invoices from the date of demand by letter dated March the 8th, 2011. The court costs are assessed against the plaintiff. Contract did not provide for the

payment of attorney's fees, so each party will be responsible for their own attorney's fees.

In June 2013, the trial court entered a written order. The order incorporated its previous oral ruling and found in favor of Autumn Creek on its breach of contract claim. The trial court reiterated that Autumn Creek was entitled to $45,165 in unpaid invoices and $10,680 in additional damages for firewood produced and sold by the rick for less than what it would have otherwise made. The trial court found in favor of Mountain Wood on Autumn Creek's claims for lost profits and tortious interference. The trial court also awarded Autumn Creek pre-judgment interest on the unpaid invoices.

From this order, both parties appeal.

## ISSUES PRESENTED AND STANDARD OF REVIEW

On appeal, Mountain Wood raises the following issues:

> Whether the Chancery Court erred in holding that Autumn Creek was not liable for delays in providing bagged firewood to Mountain Wood as expressly provided for under the Supply Contract.

> Whether the Chancery Court erred in finding Autumn Creek had not breached the Supply Contract with Mountain Wood by failing to produce the contractual amount of firewood and by failing to produce firewood in the time for delivery to retailers, and is therefore liable to Mountain Wood for cover damage.

> Whether the Chancery Court erred in its award of damages to Autumn Creek, and its award for unpaid invoices which the parties were not disputing, and which amount of damages had been agreed.

Autumn Creek raises the following additional issues:

> Whether the Chancery Court erred in its failure to award additional damages to Autumn Creek for lost profits under the Supply Contract.

> Whether the Chancery Court erred in its failure to award additional damages to Autumn Creek for tortious interference with prospective business.

Because this case was heard by a trial court sitting without a jury, we review the case *de novo* upon the record. The trial court's findings of fact are accorded a presumption of correctness,

unless the evidence preponderates to the contrary. *See* Tenn. R. App. P. 13(d); *Wright v. City of Knoxville*, 898 S.W.2d 177, 181 (Tenn. 1995). To the extent that the trial court's factual findings are based on its assessment of witness credibility, the appellate court will not reevaluate the trial court's credibility determinations absent clear and convincing evidence to the contrary. *Jones v. Barrett*, 92 S.W.3d 835, 838 (Tenn. 2002). Questions of law are reviewed *de novo* with no presumption of correctness. *Id.* The interpretation of a contract is a question of law and thus is not entitled to a presumption of correctness on appeal. *Forrest Const. Co., LLC v. Laughlin*, 337 S.W.3d 211, 220 (Tenn. Ct. App. 2009) (citing *Guiliano v. Cleo, Inc.*, 995 S.W.2d 88, 95 (Tenn. 1999); *Angus v. Western Heritage Insurance Co.*, 48 S.W.3d 728, 730 (Tenn. Ct. App. 2000)). Accordingly, the appellate court will reach its own independent conclusions regarding the meaning and legal import of contractual terms. *Forrest Const. Co., LLC*, 337 S.W.3d at 220 (citing *Guiliano*, 995 S.W.2d at 95; *Hillsboro Plaza Enterprises v. Moon*, 860 S.W.2d 45, 47 (Tenn. Ct. App. 1993)).

## ANALYSIS

On appeal, Mountain Wood essentially argues that the trial court erred in failing to find that Autumn Creek committed the first material breach of the Supply Contract, and in failing to award Mountain Creek damages against Autumn Creek for its breach. Mountain Wood contends that Autumn Creek breached the contract in two ways, "by failing to provide enough wood and provide it in a reasonable time."

We first address Mountain Wood's assertion that Autumn Creek committed the first material breach of the Supply Contract by failing to provide the firewood Mountain Wood ordered within a reasonable time. Mountain Wood argues that, under the parties' agreement, Autumn Creek was required "to get orders out when needed" and its failure to do so constituted a breach of the Supply Contract.

The cardinal rule of contract interpretation is to ascertain and give effect to the intention of the parties. *White v . Empire Exp., Inc.,* 395 S.W.3d 696, 714 (Tenn. Ct. App. 2012) (citing *Christenberry v. Tipton*, 160 S.W.3d 487, 494 (Tenn. 2005)). In interpreting a contract, we first look to the ordinary meaning of the language in the contract. *84 Lumber Co. v. Smith*, 356 S.W.3d 380, 383 (Tenn. 2011). The only temporal language in the Supply Contract that could be deemed applicable to delivery is contained in the paragraph with the heading "Term of Agreement," which states, "This Supply Contract shall be for the 2010-2011 Retail Firewood Season beginning on the date stated above until midnight on the 31st day of March, 2011." From our review of the Supply Contract, we agree with the trial court that the agreement does not specify delivery deadlines and "the issues of timeliness and delay are not clearly spelled out."

-10-

Mountain Wood acknowledges that the Supply Contract does not contain an express provision on delivery deadline, but urges this Court to supply reasonable terms for delivery. Mountain Wood contends that this Court can infer from industry norms and the course of dealing between the parties that a reasonable time for delivery of ordered firewood would be "a few days for most orders" or "within a week from the date of the receipt of a purchase order to the expected delivery date."

In response, Autumn Creek contends that the Supply Contract contains nothing that would require Autumn Creek to produce firewood in the quantities and on the schedule that Mountain Wood requested. Autumn Creek maintains that the argument Mountain Wood now makes "does not square with the contract that Mountain Wood drafted" and "simply isn't the deal that the parties entered into."

In essence, Mountain Wood asks this Court to supply a term to the parties' agreement, namely, delivery deadlines. When the parties' bargain is sufficiently definite to be a contract, but they have not agreed with respect to a term that is necessary to a determination of their rights and duties, a term which is reasonable may be supplied by the court. *German v. Ford,* 300 S.W.3d 692, 706 (Tenn. Ct. App. 2009) (citing Restatement (Second) of Contracts § 204 (1981)). For example, "failure of the parties to fix a time or a definite time for performance does not normally defeat a contract." *Id.* (citing *First Nat'l Bank of Bluefield v. Clark*, 447 S.E.2d 558, 562 (W. Va. 1994)). In that situation, the court may imply a term requiring performance within a reasonable time under the circumstances. *Id.* (citing *Minor v. Minor*, 863 S.W.2d 51, 54 (Tenn. Ct. App. 1993)).

In this case, the trial court heard testimony from Mountain Wood witnesses about the pattern of orders from customers. The Mountain Wood witnesses described the imperative that Mountain Wood deliver the firewood ordered by customers promptly or risk losing the customers and explained that was why they expected Autumn Creek to deliver the firewood ordered very soon after Mountain Wood ordered it. Thus, in effect, the Mountain Wood witnesses described an "industry norm" that Autumn Creek allegedly should have understood when the parties executed the Supply Contract and explained why the trial court should imply a term in the Supply Contract requiring Autumn Creek to deliver firewood within a short time after Mountain Wood placed each order. Under this scenario, Mountain Wood contends, Autumn Creek breached the Supply Contract. "In addition to the explicit terms, contracts may be accompanied by implied duties, which can result in a breach." *Federal Ins. Co. v. Winters*, 354 S.W.3d 287, 291 (Tenn. 2011) (citing *Aetna Cas. & Sur. Co. v. Gilreath*, 625 S.W.2d 269, 275 (Tenn. 1981)).

This argument is not unreasonable. However, Autumn Creek's owner, Mr. Crace, clearly testified that his expectations going into the 2010-2011 firewood season were not in line with

-11-

the alleged industry norm to which the Mountain Wood witnesses testified. The trial court heard the testimony of the witnesses and chose not to credit Mountain Wood's assertion that both parties would necessarily have understood its anticipated delivery pattern to be an industry norm and would have had this expectation going into the 2010-2011 firewood season. As the trial court saw and heard the witnesses' demeanor, we must defer to the trial court's assessment of their credibility. *Wells v. Tenn. Bd. of Regents,* 9 S.W.3d 779, 783 (Tenn. 1999). Consequently, we decline Mountain Wood's invitation to imply its proposed delivery deadlines into the Supply Contract.

As noted above, the Supply Contract states that the term of the parties' agreement would be "for the 2010-2011 Retail Firewood Season beginning on the date stated above until midnight on the 31st day of March, 2011." It states further that Mountain Wood "agrees to purchase from [Autumn Creek] 150,000 .75 cubic feet bags of firewood." Apparently interpreting these contractual provisions together, the trial court held, "The contract calls for [Autumn Creek] to furnish [Mountain Wood] a hundred and fifty thousand bags of seasoned firewood between August 1st, 2010, and March 31st, 2011." Putting aside the testimony of the Mountain Wood witnesses that the trial court apparently declined to credit, we cannot disagree with the trial court's construction of the Supply Contract.

Mountain Wood argues that it is "absurd" to interpret the Supply Contract as requiring only that Autumn Creek deliver all of the firewood before March 31, 2011, as this would have forced Mountain Wood to cease operations. Mountain Wood contends that the parties clearly intended for delivery times to be set by Mountain Wood, and it points to Autumn Creek's limited storage space as indicating that Autumn Creek intended to prepare orders throughout the season instead of delivering all 150,000 bundles of firewood at one time.

We agree that Autumn Creek's modest storage space indicated that it did not intend to store all 150,000 bags of firewood at once. Indeed, both parties' testimony conveyed an expectation that the firewood would not be delivered all at once. This is different, however, from interpreting the Supply Contract as requiring that Autumn Creek deliver the firewood Mountain Wood ordered shortly after each order was placed. As pointed out by Autumn Creek, the Supply Contract was drafted by Mountain Wood. Mountain Wood had the opportunity to include a provision in the Supply Contract requiring delivery of the firewood within a short time after each order was placed, but it failed to do so. Under these circumstances, we find no error in the trial court's holding that Autumn Creek did not breach the contract by failing to promptly provide firewood to fill Mountain Wood's orders.

Mountain Wood argues next that Autumn Creek breached the Supply Contract by failing to provide Mountain Wood the 150,000 bundles of firewood called for in the agreement. It is undisputed that Autumn Creek produced and delivered to Mountain Wood approximately

half of the contracted 150,000 bundles of firewood. Mountain Wood claims this constituted a breach of the Supply Contract. Mountain Wood asserts that it could have sold the additional bags of firewood specified in the Supply Contract had it been able to obtain more firewood from its suppliers, and therefore suffered damages in the form of lost opportunity to sell the balance of the firewood Autumn Creek was obliged to deliver.

The trial court found that Autumn Creek "stopped producing [bagged firewood] because [Mountain Wood] stopped ordering." The evidence in the record supports this finding. In fact, as noted by the trial court, when Mountain Wood stopped ordering, Autumn Creek had firewood on hand that it sold elsewhere. Thus, we cannot know whether Autumn Creek could have supplied Mountain Wood with the approximately 150,000 bundles of bagged firewood called for in the Supply contract by the March 31, 2011 deadline, because Mountain Wood repudiated the parties' agreement before that deadline. In addition, the trial court found that Mountain Wood "met all deliver[ie]s on sales and . . . they were not damaged." The record supports this finding as well. Mountain Wood submitted no proof of an order from a retail customer that it was unable to fill.

Mountain Wood argues next that even if Autumn Creek did not breach the Supply Contract, Autumn Creek's inability to meet Mountain Wood's demand caused delays and Autumn Creek should be liable for damages due to these delays under the damages provision in the Supply Contract. Mountain Wood asserts that, because Autumn Creek was unable to provide firewood in the volume needed for its customers, Mountain Wood had to pay more to other suppliers to meet the demand. Mountain Wood claims that it paid a total of $36,396 more than it would have paid had Autumn Creek provided the firewood needed. It contends that Autumn Creek should be liable for this amount in "cover" damages.

The trial court held that Autumn Creek was only obligated under the Supply contract to provide the contracted amount of firewood by March 31, 2011, so Autumn Creek did not breach its agreement with Mountain Wood. We have affirmed this ruling. As such, there was no breach of the Supply Contract by Autumn Creek, by delay or otherwise, for Mountain Wood to "cover." The trial court declined to award Mountain Wood such "cover" damages, and we agree with the trial court.

Finally, Mountain Wood contends that, even if Autumn Creek did not breach the Supply Contract, the trial court improperly calculated the damages awarded to Autumn Creek. Mountain Wood argues that the trial court "obviously" improperly used a figure of $45,165 contained in a demand letter that was made a trial exhibit. It also argues that the trial court erred in giving Autumn Creek credit for having paid $3,000 to Mountain Wood for the moldy wood that was returned, when in fact Mr. Crace's testimony would not support it.

We have carefully reviewed the disputed testimony and exhibits, and they are not a model of clarity. However, giving deference to the trial court's assessment of the credibility of Mr. Crace's testimony, we find there is sufficient support in the record for the trial court's calculation of the award of damages to Autumn Creek.

We turn now to the issues raised on appeal by Autumn Creek. Autumn Creek argues that the trial court erred in declining to award it damages for lost profits on the balance of the firewood that Mountain Wood did not purchase under the Supply Contract. Autumn Creek contends that it would have sold Mountain Wood 71,000 bags of firewood had Mountain Wood not repudiated and breached the Supply Contract. This firewood, Autumn Creek asserts, would have generated a profit of $63,190. In response, Mountain Wood contends that Autumn Creek never produced the firewood for which it seeks payment, so awarding damages for it would give Autumn Creek a windfall.

In addressing this issue, the trial court held that the proof submitted by Autumn Creek on its alleged lost profits was "too speculative." After examining the testimony on this issue, we agree. Though lost profits need not be proven with mathematical precision, "to recover lost profits, they must be proven with reasonable certainty and cannot be remote or speculative." *Tire Shredders, Inc. v. ERM-N. Cent., Inc.*, 15 S.W.3d 849, 857 (Tenn. Ct. App. 1999). Mr. Crace outlined a number of things he would have had to do to meet Mountain Wood's demand, such as renting additional storage space and enlisting assistance from Cowboy Charcoal, and even conceded, "There's no way I could have produced 70,000 bundles myself from February 14th to March 31st." We agree with the trial court and affirm its decision not to award Autumn Creek damages on this claim.

Finally, Autumn Creek contends that the trial court erred in declining to award it damages for Mountain Wood's alleged tortious interference with Autumn Creek's prospective business advantage. The trial court held that Autumn Creek failed to carry its burden of proof on intentional interference and specifically failed to prove that Mountain Wood "formed the requisite intent to interfere."[5]

We agree with the trial court. Indeed, after reviewing Mr. Crace's rather optimistic testimony on how Autumn Creek could have taken Mountain Wood's Publix business had

---

[5]In order to prevail on this claim, Autumn Creek must establish: (1) an existing business relationship with specific third parties or a prospective relationship with an identifiable class of third persons; (2) the defendant's knowledge of that relationship and not a mere awareness of the plaintiff's business dealings with others in general; (3) the defendant's intent to cause the breach or termination of the business relationship; (4) the defendant's improper motive or improper means; and finally, (5) damages resulting from the tortious interference. *Trau-Med of Am., Inc. v. Allstate Ins. Co.*, 71 S.W.3d 691, 701 (Tenn. 2002).

-14-

Mountain Wood not interfered, we would add that Autumn Wood did not carry its burden of proof on any of the elements of the claim. We affirm the trial court's ruling on this issue as well.

Accordingly, we affirm the trial court's ruling. All other issues raised on appeal are pretermitted by this decision.

## CONCLUSION

The decision of the trial court is affirmed. Costs on appeal are assessed one-half against Appellant Mountain Wood and its surety and one-half against Appellee Autumn Creek, for which execution may issue if necessary.

_____
HOLLY M. KIRBY, JUDGE