IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
February 4, 2020 Session[1]

# LIBERTY CONSTRUCTION COMPANY, LLC v. PETER H. CURRY, ET AL.

**Appeal from the Chancery Court for Davidson County**
**No. 15-1332-III      Ellen Hobbs Lyle, Chancellor**

_____

### No. M2019-00951-COA-R3-CV

_____

This is an action by a construction company to recover on a written stipulated sum contract and an oral cost-plus contract for the construction of a commercial building. The construction company sought to recover for additional work performed that was not included in the scope of the stipulated sum contract and the remaining balance of the cost-plus contract. The building owners contended that the construction company was not entitled to additional payment under the written agreement and counterclaimed for payments the owners made directly to suppliers for work included in the scope of the stipulated sum contract, and for reimbursement of funds expended to correct a defect caused by the construction company. The trial court held that neither the construction company nor the owners were entitled to recover under the stipulated sum contract; that the owners were not entitled to reimbursement because they failed to establish that the construction company caused the defect or, in the alternative, failed to provide a reasonable opportunity to cure; and that the construction company was entitled to judgment for work performed in connection with the cost-plus agreement. We reverse the court's determination that the owners were not entitled to a credit for certain payments made directly to suppliers, that prejudgment interest commenced on November 10, 2014, when the notice of completion was filed, and that the owners did not provide the construction company with notice and an opportunity to cure. We affirm the trial court's holding in all other respects.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court Affirmed in Part, Reversed in Part, and Remanded**

ANDY D. BENNETT, J., delivered the opinion of the court, in which THOMAS R. FRIERSON, II, J., joined. RICHARD H. DINKINS, J., not participating.

---

[1]This matter was assigned to the author on October 2, 2020.

Gregory H. Oakley, Nashville, Tennessee, for the appellants, Patricia P. Curry and Peter H. Curry.

Todd E. Panther and Hunter C. Branstetter, Nashville, Tennessee, for the appellee, Liberty Construction Company.

**OPINION**

**I. FACTUAL AND PROCEDURAL BACKGROUND**

Peter H. Curry and Patricia B. Curry ("the Currys") entered into a contract with Liberty Construction Company, LLC ("Liberty") in July 2013 for the construction of a commercial retail facility, to be known as Curry Plaza ("the Property"), on West Trinity Lane in Davidson County, for the fixed sum of $329,000. The initial contract provided for the construction of the shell building and the finishing out of the interior of one of three bays, referred to as the "Cashville bay." As work progressed, the scope expanded to include modifications to the original plans as well as the interior finish of the other two tenant bays, to be occupied by a single tenant for the operation of a convenience market, referred to as the "Market Finish." The parties orally agreed that the Market Finish project would be completed on a cost-plus 15 percent basis. On November 10, 2014, a notice of completion was filed. The parties were unable to agree on whether Liberty was entitled to additional payment under the stipulated sum contract or what the remaining balance was under the cost-plus agreement.

Liberty filed suit on November 5, 2015, asserting claims for breach of contract and a mechanic's and materialman's lien. The Currys answered and filed a breach of contract counterclaim alleging that Liberty failed to construct the Property in accordance with the plans and failed to perform the work in a workmanlike and timely manner. The Currys also counterclaimed that Liberty had "willfully and grossly exaggerated the amount" of its lien. The three-day bench trial began on February 19, 2019.

On April 1, the court entered its memorandum and order of findings of fact and conclusions of law, which were later incorporated into the final order entered on April 30. The court awarded Liberty $90,302.61 in damages, plus prejudgment interest in the amount of $39,658.92, for the total sum of $129,691.53; it dismissed the counterclaim for lack of proof.

The Currys appeal, raising the following issues:

1. Whether the evidence preponderates against the trial court's award of damages to Liberty in the amount of $90,302.61 for the cost of the Market Finish.

2. Whether the trial court erred in ruling that the Currys were not allowed a credit of $24,986.40 for amounts paid by them directly to suppliers for materials used in the construction of work covered under the stipulated sum contract.

3. Whether the evidence preponderates against the trial court's ruling that the Currys were not entitled to recover $9,635 for the cost of correcting defects in a stormwater detention pond caused by Liberty's failure to construct the pond according to construction plans.

4. Whether the trial court erred in awarding prejudgment interest on the award for the Market Finish from the date of completion of construction rather than the date when Liberty provided the Currys with the amount it claimed for the Market Finish.

## II. ANALYSIS

*A. Award of Damages under the Cost-Plus Contract*

The Currys contend that the evidence preponderates against the court's award of damages under the cost-plus contract because the award was based on Liberty's approximation of costs incurred for the construction of the Market Finish. Although they concede in their brief that they are liable to Liberty, the Currys argue they are only liable for $25,877.80 according to their calculation of costs based on Liberty's records. The Currys also assert that Liberty failed to satisfy its burden of itemizing the costs of the work performed and proving that the costs were reasonable.

As we consider this issue, we are guided by the following principles:

Determinations concerning the amount of damages are factually driven. Thus, the amount of damages to be awarded in a particular case is essentially a fact question. However, the choice of the proper measure of damages is a question of law to be decided by the court.

*Beaty v. McGraw*, 15 S.W.3d 819, 827 (Tenn. Ct. App. 1998) (citations omitted), *abrogated on other grounds by Bowen ex rel. Doe v. Arnold*, 502 S.W.3d 102 (Tenn. 2016). Review of the trial court's findings of fact is de novo upon the record, accompanied by a presumption of correctness, unless the preponderance of the evidence is otherwise. TENN. R. APP. P. 13(d); *Kaplan v. Bugalla*, 188 S.W.3d 632, 635 (Tenn. 2006). Review of the trial court's conclusions of law is de novo with no presumption of correctness afforded to the trial court's decision. *Kaplan*, 188 S.W.3d at 635.

1. Itemization of Costs

The first issue we address is whether Liberty's records sufficiently itemized the costs associated with the construction of the Market Finish. The trial court did not make any factual findings regarding the sufficiency of Liberty's records of the costs incurred in the construction of the Market Finish. In *Shore v. Maple Lane Farms*, *LLC*, the Supreme Court stated that, "[i]f the trial court has not made a specific finding on a particular matter, we review the record to determine where the preponderance of the evidence lies without employing a presumption of correctness." *Shore*, 411 S.W.3d 405, 414 (Tenn. 2013) (citing *Hickman v. Cont'l Baking Co.*, 143 S.W.3d 72, 75 (Tenn. 2004); *Ganzevoort v. Russell*, 949 S.W.2d 293, 296 (Tenn. 1997)).

This Court addressed the sufficiency of a construction company's itemization of costs under a cost-plus contract in *Forrest Construction Co., LLC v. Laughlin*, a case in which the landowners contended that the construction company materially breached the cost-plus contract because the company "fail[ed] to properly document and account for the expenses it sought to recover in its draw requests." *Forrest Constr.*, 337 S.W.3d 211, 221 (Tenn. Ct. App. 2009). After holding that the construction company breached the provision that conditioned the obligation to pay on having documented and accounted for the expenses, this Court provided the following standard to apply when reviewing a cost-plus contract:

> "In any cost-plus contract there is an implicit understanding between the parties that the cost must be reasonable and proper. The contractor is under a duty of itemizing each and every expenditure made by him on the job and where the owner denies being indebted to the contractor the latter has the burden of proving each and every item of expense in connection with the job."

*Id.* at 223 (quoting *Kerner v. Gilt*, 296 So. 2d 428, 431 (La. Ct. App. 1974)). In applying this standard, the *Forrest Construction* Court discussed the condition of the construction company's records, noting that the documentation was "a wholly disorganized, un-itemized box of documents, many of which were unrelated to [the landowners'] home"; that it "failed to identify or itemize the charges that pertained to [the landowners'] home only"; that it was "not sufficient to establish 'the actual net costs of all direct materials, labor, services, and fees'"; and that the construction company "never provided 'full back-up support for all amounts requested'" and failed to provide "'accurate records.'" *Id.* at 224.

In *Raines Brothers, Inc., v. Chitwood*, this Court again considered whether the contractor had sufficiently itemized costs incurred under a cost-plus contract. *Raines Bros.*, No. E2013-02232-COA-R3-CV, 2014 WL 3029274, at *9 (Tenn. Ct. App. July 3, 2014). The Court determined that "[a] thorough review of the exhibits submitted at trial

demonstrate[d] that [the contractor] maintained daily records itemizing the labor costs, number of laborers on site, activities of subcontractors, and tasks completed." *Id.* We further noted that the home occupant's comptroller testified that "the invoices were complete and allowed him to fully separate and itemize the costs of the project on his own spreadsheets." *Id.* The Court held that the proof provided by the contractor was "more than sufficient to demonstrate its costs with regard to [the] contract."[2] *Id.*

We turn to the evidence of costs in the record. Hamid Arab, the managing member of Liberty, testified regarding Exhibit 19, which is a ledger produced from the entries on Liberty's accounting software. The list categorizes each expense as direct labor, construction material and costs, subcontractors, rental jobs, or other construction costs; it also contains the date of each transaction, the name of the recipient, and a description of what each charge was for, such as "building permits" or "masonry." Several items on the list are highlighted, and Mr. Arab testified that the highlighted portions reflect those expenses incurred in finishing all three bays. Exhibit 20 lists the amounts due for the construction of the shell and the completion of all three bays; the document provides that $146,061.56 was due to Liberty for the buildout of the three tenant bays. Exhibit 21 contains the checks and invoices that correspond with the entries on Exhibit 19 and shows what was paid to subcontractors, employees, and vendors. The invoices identify what was being purchased, the amount of money spent, the dates of purchase, and the project with which the expense is associated.

Mr. Curry did not testify that the condition of the invoices or Liberty's itemization were so disorganized that he was unable to identify which charges Liberty attributed to the stipulated sum contract and which it attributed to the cost-plus contract. Rather, he testified that certain items should have been connected to the construction of the shell but were incorrectly attributed to the Market Finish. Mr. Curry stated that he used the costs provided in Liberty's ledger, introduced as Exhibit 19, as well as the invoices contained in multiple exhibits, to conduct his own calculation of the amount due to Liberty for the Market Finish.

Upon our review of the evidence, we conclude that Liberty's records were sufficiently itemized to satisfy its burden under the cost-plus contract.[3] As in *Raines Brothers*, the construction company's records in this case were sufficiently itemized to permit Mr. Curry to conduct his own calculation. The Currys' argument is not well taken.

---

[2] In *Raines Brothers*, the costs themselves were not disputed.

[3] Because the Currys did not assert that the costs were unreasonable at trial, they are barred from contending otherwise on appeal. *See Barnes v. Barnes*, 193 S.W.3d 495, 501 (Tenn. 2006).

2.  Proof of Damages

With respect to the amount due to Liberty under the Market Finish contract, the court awarded Liberty $90,302.61 based on the following calculation:

> The Court's calculation adopts the Plaintiff's calculation but assigns a 33% share to the Cashville finish of the one tenant bay covered by the Contract instead of the 22% asserted by the Plaintiff. The Court's calculation is as follows.
>
> Beginning with $146,061.56 of the highlighted overage cost on Trial Exhibit 19, the Court deducts $3,492.94 for brick the Plaintiff agreed to deduct, which leaves $142,568.62. Assigning one-third of that to the Cashville finish, as one of three tenant bays, equals $47,522.87. Deducting the $47,522.87 for the Cashville finish from the $142,568.62 overage leaves $95,045.75 for the cost of the Market Finish. 15% for overhead and profit of the $95,045.75 is $14,256.86. That is added for a total of $109,302.61 attributable to the Market Finish. That amount, then, needs to be filtered through the payments and stipulated sum Contract, as follows.

| | |
|---|---|
| Fixed sum Contract to construct shell and Cashville interior | $329,000.00 |
| Market Finish | + $109,302.61 |
| | $438,302.61 |
| Payments made by Defendants | - $348,000.00 |
| | $90,302.61 |

The Currys argue that the court's award of $90,302.61, which was based upon its estimate that the cost of the Market Finish constituted 2/3 of the total cost for the construction of all three interior bays, was contrary to the preponderance of the evidence, and allowed Liberty to inflate the costs. In their brief, they argue that the entries regarding the costs of labor, plumbing, painting, and framing were inflated and contrary to the corresponding invoices. They also argue that the cost of the HVAC units should not have been included in the cost for the Market Finish.

This Court addressed a similar argument in *Raines Brothers, Inc. v. Chitwood*, where the defendants asserted that the plaintiff failed to establish the actual cost of the work performed under the parties' cost-plus contract. *Raines Bros.*, 2014 WL 3029274, at *8. We held that, "[u]nlike the contractor in *Forrest* [*Construction*], there was no proof in the instant case of 'disorganized, un-itemized' documents that were unrelated to the project, or 'spreadsheet[s] [that] failed to identify that the expenditures pertained to materials, labor,

services, and fees that went into the construction of the [subject] home.'" *Id.* at *9 (quoting *Forrest Constr.*, 337 S.W.3d at 223-24). The Court determined that the plaintiff "provided spreadsheets itemizing the project transactions for subcontractors, materials, and equipment, and even provided detailed labor cost records that reflected individual hours charged for each date and worker involved," and that this documentation was "more than sufficient to demonstrate its costs with regard to this contract." *Id.*

"Damages for breach of contract may be awarded even where it is impossible to prove the exact amount of damages." *Forrest Constr.*, 337 S.W.3d at 232 (citing *Moore Constr. Co., Inc. v. Clarksville Dep't of Elec.*, 707 S.W.2d 1, 15 (Tenn. Ct. App. 1985)). "All that is required is proof with a reasonable degree of certainty." *Id.* "'As a general rule, the measure of damages for defects and omissions in the performance of a construction contract is the reasonable cost of the required repairs.'" *GSB Contractors, Inc. v. Hess*, 179 S.W.3d 535, 543 (Tenn. Ct. App. 2005) (quoting *Nutzell v. Godwin*, No. 33, 1989 WL 76306, at *1 (Tenn. Ct. App. July 13, 1989)).

Mr. Arab testified that he could not decipher how much of the $146,061.56 was for the Cashville bay and the subsequent Market Finish bays, but that he could give a reasonable approximation; that Mr. Curry did not direct Liberty's supervisors to separate their costs for the Cashville bay, the construction of the shell, and the Market Finish bays, and that it was nearly impossible for him to recreate that breakdown after the fact; that he identified the costs for the interior finishes of the three bays in Exhibit 19, which was created based on the invoices; and that he attributed 20 to 22 percent of costs to the Cashville bay and the remaining percentage to the Market Finish bays based on the bay sizes and deviations from the original plan.[4]

Mr. Curry testified that the building permit for the Market Finish was not issued until May 21, 2014. He calculated the costs for the Market Finish based upon the invoices provided and Exhibit 19. Based on these documents, Mr. Curry calculated that the total cost of the material and labor for the electrical work was $5,823, the cost of plumbing was $9,750, the framing, dry wall, and ceiling totaled $9,600, the painting totaled $3,000, and the total sum of these costs, attributed to the Market Finish, was $28,173. With respect to labor costs, Mr. Curry testified that supervisor Rodney Williams was being paid $1,300 every two weeks, but he explained that these earnings were not included in his calculation because Mr. Williams was the supervisor for both projects, which were being done simultaneously. Mr. Curry also testified that each bay is equal in size, roughly 2,000 feet. In Mr. Curry's testimony regarding the HVAC units, he stated that Exhibit 19 contained an entry on July 14, 2014, for three HVAC rooftop units at a cost of $1,174.66; and that he attributed this expense to the construction of the shell because the units were shown on the construction drawings and included in Liberty's pay requests under the stipulated sum

---

[4] In its responses to the Currys' second set of interrogatories, Liberty stated that it attributed one-third of the overage cost for finishing the interior of the Property to the stipulated sum contract and two-thirds to the Market Finish.

contract as "mechanical." In contrast, Mr. Arab testified that the Exhibit 19 line item dated September 19, 2014, to Ken Reasoner Sheet Metal for "mechanical HVAC" was for the HVAC units, and that Ken Reasoner did the mechanical work for all three interior spaces.

Exhibit 19, which was the ledger, identifies which expenditures pertained to materials, labor, supervisory costs, and services; the transactions reflected in the ledger are supported by the invoices provided in the record. The plumbing invoices, introduced into evidence as Exhibit 35, support Liberty's itemization of costs following the date the permit for the Market Finish was issued, as well as the Currys' contention that the contract price for the Market Finish provided on the invoice was $9,750. Each of the invoices is labeled as a "proposal" and has an attachment that provides the check amount paid by Liberty. The painting invoices, introduced into evidence as Exhibit 37, reflect that Liberty paid a total of $8,500, with the first payment being issued on September 5, 2014. The invoices for the framing, drywall, and ceiling, totaling $14,275, were introduced into evidence as Exhibit 36. With respect to labor, Exhibit 19 supports Mr. Curry's testimony that Mr. Williams was being paid $1,300 approximately every two weeks; his earnings statements are contained in Exhibit 21. Exhibit 19 states that the "RTUs"[5] were purchased on July 14, 2014, from Crescent Electric Supply; the corresponding invoice is contained in Exhibit 21 and lists the same total as the ledger, $1,174.65; the invoice also contains a handwritten notation that says "All RTUs 641.00." Moreover, Exhibit 19 supports Mr. Arab's testimony that Ken Reasoner was paid for doing the mechanical work on the HVAC units on September 9, 2014. The drawing labeled "S1.1," dated January 9, 2013, included in the record as Exhibit 46, supports Mr. Curry's testimony that the three RTUs appeared in the original construction plans.[6]

The Currys' argument is premised on Liberty's attribution of 78 percent of the total cost for finishing the three interior bays to the Market Finish. They contend that Liberty inflated individual expenses by assessing 78 percent of each cost to the Market Finish. However, this premise is not supported by the evidence, as Mr. Arab's testimony does not account for 78 percent of each expense in his calculation of the total cost incurred. Mr. Arab utilized this percentage as a way of apportioning the total overage cost to determine what amount should be applied to the Cashville bay and what amount should be applied to the Market Finish bays. The trial court adopted the costs itemized in Exhibit 19 and the total cost reflected in Exhibit 20, and attributed 33 percent of that total to each bay; this percentage attribution is supported by Mr. Curry's testimony that each bay is roughly the same size. Though there is conflicting evidence in the record as to what costs were attributable to the construction of the shell versus the Market Finish, the Currys do not cite

---

[5] According to Mr. Curry's testimony, "RTU" is used to refer to the HVAC rooftop units.

[6] Though the Currys deny that they are "liable to Liberty for the cost of the HVAC units for the market area as part of the Market Finish," they do not cite to any evidence contesting the costs provided in Exhibit 19.

to evidence that would preponderate against the court's findings and resulting calculation of damages based upon the costs provided by Liberty.

Based upon our review of the record, we conclude that Liberty's itemized ledger accurately reflects the purchases contained in the invoices and that, collectively, the documents are sufficient to demonstrate, with a reasonable degree of certainty, the costs incurred under the Market Finish contract. Accordingly, we discern no error in the court's calculation of damages.

*B. Credit for Payments Made by the Currys under the Stipulated Sum Contract*

The Currys argue that the trial court erred in denying their request for a credit of $24,986.40 for the payments they made directly to suppliers for the materials used to complete the stipulated sum contract, thereby allowing Liberty to be unjustly enriched. Liberty contends that the Currys failed to establish that these expenses were made in connection with the stipulated sum contract or were connected to Curry Plaza and that, in the absence of any evidence that the parties agreed that the Currys would pay for materials directly, the court correctly excluded those expenses.

The Tennessee Supreme Court provided the following standard by which courts are to review written agreements:

> The interpretation of written agreements . . . is a matter of law that this Court reviews de novo on the record according no presumption of correctness to the trial court's conclusions of law. A cardinal rule of contract interpretation is to ascertain and give effect to the intent of the parties. In interpreting contractual language, courts look to the plain meaning of the words in the document to ascertain the parties' intent. . . . If the language is clear and unambiguous, the literal meaning controls the outcome of the dispute. If, however, the words in a contract are susceptible to more than one reasonable interpretation, the parties' intent cannot be determined by a literal interpretation of the language.

*Allstate Ins. Co. v. Watson*, 195 S.W.3d 609, 611 (Tenn. 2006) (citations omitted). Therefore, we will look to the agreement to determine what was included in the scope of the work and then determine whether the evidence establishes that Mr. Curry paid for materials for the construction of Curry Plaza that would entitle him to a credit toward the $329,000 contract price.

The trial court denied Liberty's claim for $18,819.86 for additional labor and materials to complete the fixed cost contract, a ruling it does not challenge on appeal. The court denied this claim because Liberty failed to "go to the drawings and specifications and demonstrate, at least with a representative sampling, the deficiency of the drawings and

specifications, and the extras [Mr. Arab] had to provide" and instead offered only "very generalized proof that he did work, in addition to the scope of the Contract, because of lack of detail of the drawings and plans." The court then held:

> Along the same lines, the Court denies the Defendants' claim of a $24,986 credit (see trial Exhibit 32) for costs for materials he claims he paid for directly that were used in construction of the shell for Curry Plaza. The parties' Contract was for a $329,000 fixed sum, and there was no written amendment or provision made therein for the materials paid for by the Defendants to be deducted from or credited to the $329,000 fixed sum.[7]

The stipulated sum contract was an AIA Standard Form Agreement for the construction of the "3,000 sq. feet [n]ew retail facility [o]n Trinity Lane." The agreement provides that the sum of the contract was $329,000; that the scope of the work was contained in the contract documents; and that the contract documents consisted of the drawings of the site plan, erosion plan, grading plan, drainage structure, detail, retaining wall detail, landscaping, building floor plan, building tenant plan, foundation plan, and roof framing plan. Consistent with the terms of the agreement, Liberty introduced Exhibit 4, which contained a development cost estimate listing the work that would be included in the $329,000 contract amount as follows: site prep, sidewalk, storm water facility, 3,000-square-foot building, 1,000-square-foot buildout, parking, and signage. The parties do not contest that these items were included in the scope of the work covered under the stipulated sum contract.

On cross examination, Mr. Curry testified that Exhibit 32 consisted of a spreadsheet of the payments made by him to subcontractors and material suppliers, invoices, and his credit card statements; that the transactions listed on the spreadsheet were within the scope of work provided for in the $329,000 fixed sum for the construction of the shell and the Cashville buildout; and that the record does not contain invoices to support every one of the transactions, but there is a charge for each item reflected in the credit card statements. Exhibit 32 is a collective exhibit containing a spreadsheet of 23 payments made by Mr. Curry in the total amount of $24,986.40. The exhibit provides the following details about payments: the recipient of the payment, the amount paid, and the item that was being paid for. The exhibit includes the following documents that support the purchases listed in the spreadsheet: four invoices from Peppers Concrete Pumping that correspond with payments for $879.80 and $866.55 on February 10 and February 21, 2014; a confirmation email from Nashville Ready Mix dated December 20, 2013, regarding a concrete delivery totaling $2,115.52; and an invoice totaling $3,188.35 from Alley-Cassetty Brick dated January 23, 2014. The remaining purchases listed, which include transactions for concrete, block, and

---

[7] The court also held that the parties waived the change order procedure; the parties do not dispute this holding.

- 10 -

roofing, are only supported by Mr. Curry's credit card statements, which identify the date of payment, the recipient of the payment, and the amount paid.

The credit card statements do not establish whether the charge was made in connection with Curry Plaza or another project. The only evidence that these purchases were made for the construction of Curry Plaza is Mr. Curry's testimony. On cross examination, when asked why these transactions were not supported by invoices, Mr. Curry responded that there was a charge on his credit card for each of the purchases and that, "if you can explain to me why I would be purchasing $4,065 worth of concrete on February 12th, explain to me where would it be other than Trinity, I'll take it off of the list." Mr. Curry did not provide further explanation regarding the evidence that would support the purchases that do not contain a corresponding invoice in the record. In order for this court to conclude that the credit card statements support the Currys' claim for a credit, we would have to assume that the purchases were made for Curry Plaza based on the date of purchase and Mr. Curry's reasoning of "why else would he make the purchases." We decline to make this assumption and conclude that this generalized proof is not sufficient.

This court addressed a similar argument in *John J. Heirigs Construction Co., Inc. v. Exide*, where this court was called upon to review whether the trial court erred in its determination that the plaintiff construction company could recover under the theories of unjust enrichment and quantum meruit. *John J. Heirigs Constr.*, 709 S.W.2d 604, 607 (Tenn. Ct. App. 1986). We held that "it [was] uncontroverted that the defendants paid the full contract price for the improvements to the property," and "under no stretch of the imagination could it be said that the defendants were unjustly enriched *nor could it be said that equity demands that defendants be required to pay twice*." *Id.* (emphasis added). Although the facts in this case are distinguishable from *John J. Heirigs Construction* to the extent that the Currys are asserting that Liberty was unjustly enriched by receiving the full contract price of $329,000 without discounting the materials paid for by Mr. Curry, the same principle of equity applies. Consistent with the holding in *John J. Heirigs Construction* that equity does not demand that a party be required to pay twice for the same expense, we conclude that the Currys are entitled to a credit for materials they purchased that were included in the stipulated sum contract price to prevent double payment for the same expense. Thus, the Currys were entitled to deduct those purchases supported by the invoices identified above, totaling $7,050.22, from the $329,000 contract price, and we reverse the court's conclusion to the extent that the Currys are entitled to recover for these specific purchases. However, we agree with the trial court's conclusion that the Currys failed to point to specific evidence demonstrating that the remaining purchases were made in connection with the Curry Plaza project. Therefore, we affirm the court's holding that the Currys are not entitled to a credit for the remaining purchases, totaling $17,936.18, that were not supported by invoices.

*C. The Cost of Correcting the Bioretention Pond*

The Currys argue that the trial court erred in dismissing their claim for the cost of correcting a defect in the bioretention pond,[8] a total of $9,635. Liberty contends that the Currys are not entitled to recover the costs for correcting the pond because they failed to establish that Liberty caused the defect and did not provide notice and an opportunity to cure. The parties do not dispute that the construction of the pond was within the scope of the work covered by the stipulated sum contract.

The trial court held:

> Lastly, the Defendants claim a credit or offset from the Plaintiff's recovery for the fee of a civil engineer and work done by another construction company to add more block and increase the height of a bioretention pond on the project to thereby increase the volume of the pond as required by Metro. The credit/offset asserted by the Defendants is dismissed.
>
> The main reason for the dismissal is that if the Defendants were asserting the Plaintiff made an error in construction, the Defendants were required under Tennessee law to provide the Plaintiff notice and opportunity to cure.
>
> > As a general rule, a party alleging defects in the performance of a contract is required to give notice and a reasonable opportunity to cure the defects. *Carter v. Krueger*, 916 S.W.2d 932, 935 (Tenn. Ct. App. 1995). This is to "allow the defaulting party the opportunity 'to repair the defective work, to reduce the damages, to avoid additional defective performance, and to promote the informal settlement of disputes.'" *Custom Built Homes*, 2006 WL 3613583, at *5 (quoting *Carter*, 916 S.W.2d at 935).
>
> *Forrest Const. Co., LLC v. Laughlin*, 337 S.W.3d 211, 229 (Tenn. Ct. App. 2009). This was not provided, the Court finds. Trial Exhibit 26, the Court finds, does not constitute an opportunity to cure.

---

[8] Mr. Arab testified that a bioretention pond is "an area in the property that manages the storm runoff, all the runoff from impervious areas, which is the roof, the paving areas that is introduced to the infrastructures had it not been in containment"; that one of the requirements from Metro Storm Water is to manage the runoff by various means, depending on how much area there is on the site; and that this site required a bioretention, which he described as "a pond that is filled with organic matters and have plant material . . . inside of it."

Further, the Court finds that the Defendants failed to prove that the additional work performed on the bioretention pond was caused by mistake or negligence of the Plaintiff in not installing an elongated footer. The Court accredits the Plaintiff's testimony, as an experienced general contractor, that the drawings showed the elevation of the retention pond in conflict with the footing and foundation of the building, and that the Plaintiff constructed this area the only way he could. There was not sufficient proof by the Defendants of error by the Plaintiff on this issue. Nevertheless, even if there was an error by the Plaintiff, as analyzed above, the Defendants cannot recover because the Plaintiff was not provided an opportunity to cure.

We must first determine whether the Currys were excused from providing notice and an opportunity to cure; then, we will proceed to determine whether the evidence establishes that Liberty caused the defect and whether the Currys provided Liberty with notice and an opportunity to cure the defect.

As noted by the trial court, "[A] party alleging defects in the performance of a contract is required to give notice and a reasonable opportunity to cure the defects." *Forrest Constr.*, 337 S.W.3d at 229 (citing *Carter*, 916 S.W.2d at 935). In *Forrest Construction*, the construction company argued that the fact that the defects were repaired or discovered after litigation had commenced did not excuse the landowners from their duty to provide notice and an opportunity to cure. *Id.* This Court held that, because there was both a lawsuit and a lien that predated the discovery of the defects, and that "by the time the defects were discovered, [the construction company] had already abandoned the job site," the landowners were excused from the requirement to provide notice and an opportunity to cure. *Id.* at 230-31.

The Currys contend that they were excused from providing notice and an opportunity to cure on the grounds that it was "extremely unlikely" that Liberty would have corrected the defect because Liberty disputed that it caused the defect, it had already filed a lien against the property, and it had filed suit against the Currys.

In his testimony about the circumstances that led to a change in the construction of the pond at Curry Plaza, Mr. Arab stated that he and Mr. Curry agreed to deviate from the plans by eliminating a wooden platform because they felt it was unnecessary; that this change allowed them to put an earthen walkway against the building; that it was understood that this change needed to be approved by the city before the building was finalized; and that the change to the walkway altered the design of the bioretention pond.[9] When asked

---

[9] Mr. Arab testified that a bioretention pond is filled with amended soil. He explained that, whereas amended soil is not compactible, an earthen walkway "is just fill dirt that you can compact," upon which one can build sidewalks and parking lots.

about the impact that the construction of the earthen walkway had on the bioretention pond, Mr. Arab testified:

> Q. You had mentioned that the construction of the walkway had had an impact on the volume of the bioretention pond?
> A. Correct.
> Q. What was that impact?
> A. Well, because of that area that we filled, against the building, that took away from volume of the pond. If you refer to our drawings, basically amended soil would have gone against the building which is [a] major design flaw.
> Q. Why is that?
> A. Well, the footing has to have -- not only has to have the freeze protection, which is 20 inches in our area, so top of the footing needs to be 20 inches below -- the bottom of the footing needs to be 20 inches below grade our design showed that we were actually two inches above grade.
> Q. Did you compensate for that lost volume?
> A. We did. Actually needed to be -- the retaining wall needed to be increased in size. Basically what volume we lost, we would have compensated on the opposite side by increasing the height of [the] retaining wall. But Mr. Curry clearly was made aware of this requirement that this volume compensation couldn't just be done in the field. We had to have an engineer redesign this bioretention area and calculate how much area we lost and therefore recommend how much we needed to gain.

On cross-examination, Mr. Arab testified again about the circumstances that led to the deviation from the original plans:

> Q. Okay. Tell me what happened, then?
> A. As I testified earlier, the elevated pathway, or walkway, was a feature that was disliked by both Peter [Curry] and I. So neither one of us really cared for that feature. So we both know that -- we both knew that that part of the plan, we're not going to follow.
> Q. You jointly decided that you were not going to follow that part of the plan?
> A That's pretty much both of our --
> . . . .
> Q. Why would removing a walkway cause issues with the bioretention pond?
> A. Okay. If you study the plans, it shows that the surface of the bioretention pond is almost lower than top of the footing. We could not build a building like that. That building would have been caved in years ago. So we had to basically reinforce the footing by not excavating the bioretention pond as it was shown.

- 14 -

Mr. Arab also testified that, up until the time he completed the job and provided the certificate of occupancy, he did not know whether Mr. Curry had hired an engineer or not. Counsel for the Currys then showed him an email, dated November 7, 2014, from Roy Dale, a civil engineer, to Mr. Curry, who had then forwarded it to Mr. Arab on November 8, 2014. Upon reading the email, Mr. Arab testified that he recommended Mr. Dale, and that he was aware that Mr. Curry had commissioned Mr. Dale to evaluate the pond. This forwarded email contains a detailed explanation of the defects of the pond and a general recommendation of proposed remedies. At the end of the email, Mr. Dale recommended that Mr. Curry contact Terry Flatt with Southern Nurseries to look at the pond and provide an estimate of what it would cost to correct the defects "[i]f he had not paid for this work, or if he had enough dollars retained to pay for the work needed." Mr. Curry, in forwarding the message to Mr. Arab, added only a question mark.

Roy Dale, the civil engineer Mr. Curry hired in 2014 to evaluate the defects in the pond, testified that he was hired because "there were issues with Metro Storm Water in regards to retention or a detention pond that had been partially constructed"; that when he went to the site he compared the original construction plans to what was actually constructed and noticed some differences; that he was asked to look specifically at the storm water; that, "[a]t Metro, when you're at the completion of a project, most developments require the developer to install a storm water management area for detention and for bioretention"; and that, "in this case, the storm water area did not have the volume that was required in order for Metro to sign off." When asked whether he determined why the pond did not have sufficient volume, Mr. Dale testified:

> I physically looked at the construction, and I could see that on the plans, it appeared that the building itself had, like, an extended foundation wall, but in actual reality, when they constructed it, they put a fill slope against the wall, and that -- therefore, fill had been placed within the area that was supposed to retain storm water. And, therefore, the volume of it was not there; the volume had been lost. And so I sent a survey crew out there to confirm and get elevations of that. And we did an as-built survey, which we had to provide to Metro, and the as-built indicated that the volume was not sufficient.

Mr. Dale further stated that what caused the volume to be insufficient was the failure to construct "one of the walls of the building [that] could extend down below the grade in order to act as a retaining wall, where a wall would be placed next to that to extend down below the grade in order to create the volume that was needed." When asked how he recommended remedying the problem, he testified:

> Since it had a lot of dirt inside of it -- and you couldn't excavate that dirt out, because the wall had not been extended on one side for a retaining wall -- our solution was, simply, why don't we just add some concrete block,

increase the height of the wall, and, therefore, increase the volume, and that should work.

When the Currys' counsel asked Mr. Dale about the as-built survey admitted as Exhibit 29, he testified that it was prepared in September or October 2015 and showed the original conditions that he had observed. As to why it took from October 2014 to October 2015 to prepare the as-built drawing, Mr. Dale testified that he would discuss it, presumably with Mr. Curry, and it would be weeks or months before he was contacted again. Mr. Dale characterized Exhibit 30 as the as-built survey, dated September 29, 2016, that he completed after his remedial design was implemented. When questioned about his knowledge of the previous changes that had taken place, Mr. Dale testified that he was not familiar enough to know that the original drawings provided for a wooden walkway to be extended along the face of the building; that he did not know what led to the change; and that he was hired to "look at elevations and conditions, not to evaluate anyone's design," and "it was just simply a matter of the volume."

Mr. Curry testified that he became aware that there was an issue with the pond when he received an email on September 22, 2014, from an enforcement officer at Metro Storm Water stating that, before they could "occupy the building, [they had] to submit . . . as-built certification from a licensed engineer that the detention pond was constructed in accordance with the plan that had been previously approved by Storm Water Management." Mr. Curry further testified that, a day or two later, Mr. Arab told him that there was a problem, "the foundation subcontractor missed the elongated footing on the east side of the building," and Mr. Curry needed to hire an engineer; and that Mr. Arab never said anything to him about the walkway until trial. When asked about the walkway, Mr. Curry testified that it was an elevated walkway that was never built and would have been above the detention pond; that he did not want the walkway, and it was not necessary regardless of whether it was earthen or wooden; that he went to Metro to advocate for the removal of the walkway from the plans on August 7, 2014, and Metro signed off on it; and that the removal of the walkway was not memorialized by a written change order. Mr. Curry stated that he knew that the as-built condition of the bioretention pond was not going to meet the codes requirements because Mr. Arab told him so, prior to hiring Mr. Dale; and that, once Mr. Arab explained the problem to him, Mr. Curry responded, "Well, of course it's not; they just took up part of the volume in the pond."

When questioned as to what notice he provided to Mr. Arab that the pond was built incorrectly, Mr. Curry testified that the email, admitted as Exhibit 26, stated, "I am convinced that your contractor hasn't the faintest clue as to what's going on here," and, "Because of the elongated footing left out by Mr. Arab, we're going to have to redo the pond"; that he forwarded that email to Mr. Arab; that by the time Mr. Curry learned what was wrong, he and Mr. Arab were already involved in litigation; and that Mr. Arab became aware of the problem with the pond when he informed Mr. Curry about the missing elongated wall and through a series of emails Mr. Arab received from Metro Storm Water

Management.[10] Mr. Curry testified that he paid Mr. Dale $2,895 for the correction of the defect in the pond and introduced the invoices of payments to Mr. Dale.

The testimony and exhibits establish that Mr. Curry notified Mr. Arab of what the defects were on November 8, 2014, prior to Liberty filing suit on November 5, 2015; that Mr. Dale was hired in October 2014, but did not complete an as-built survey of the original condition of the pond until October 2015; and that Liberty completed construction on Curry Plaza and did not leave the project until after the notice of completion was filed on November 10, 2014. Liberty did not file suit until well after Mr. Curry had been made aware of the defects and what would be necessary to cure them. Therefore, we conclude that this case is distinguishable from *Forrest Construction* in that this litigation did not predate the discovery of the defects and there is no evidence that Liberty was "extremely unlikely" to cure the defects. Thus, the Currys were not excused from providing notice and an opportunity to cure. We proceed to determine whether the evidence shows that Liberty caused the defects and whether the Currys provided notice and a reasonable opportunity to cure.

Tennessee Code Annotated section 66-36-103, governing construction defects, provides the following with respect to notice and a reasonable opportunity to cure:

> (a) In actions brought against a prime contractor, remote contractor, or design professional related to an alleged construction defect, the claimant shall, before filing an action, serve written notice of claim on the prime contractor, remote contractor, or design professional, as applicable. The claimant shall endeavor to serve the notice of claim within fifteen (15) days after discovery of an alleged defect, or as required by contract. Unless otherwise prohibited by contract, the failure to serve notice of claim within fifteen (15) days does not bar the filing of an action, subject to § 66-36-102.

> (b) Within ten (10) business days after service of the notice of claim, the prime contractor, remote contractor, or design professional may inspect the structure to assess each alleged construction defect. The claimant shall provide the prime contractor, remote contractor, or design professional and its lower-tier remote contractors or agents reasonable access to the improvement during normal working hours to inspect the improvement, to determine the nature and cause of each alleged construction defect, and the nature and extent of any corrections, repairs, or replacements necessary to remedy each defect. . . .

> . . . .

---

[10] The emails from Metro Storm Water Management to Mr. Arab are not contained in the record before us.

(e) Within thirty (30) days after receiving the notice of claim, each prime contractor, remote contractor, or design professional must serve a written response to the claimant. The written response must provide:

(1) A written offer to remedy the alleged construction defect at no cost to the claimant, including a report of the scope of the inspection, the findings and results of the inspection, a detailed description of the corrections or repairs necessary to remedy the defect, and a timetable for the completion of the repairs;

. . . .

(j) If the claimant accepts the offer of a prime contractor, remote contractor, or design professional to correct or repair an alleged construction defect, then the claimant shall provide the prime contractor, remote contractor, or design professional and their remote contractors or other agents reasonable access to the claimant's improvement during normal working hours to perform the correction or repair by the agreed-upon timetable as stated in the offer.

The testimony in this case shows that the parties agreed to deviate from the original plans and not construct the elevated walkway; that the change rendered Liberty unable to construct the pond according to the original plans; and that Mr. Arab informed Mr. Curry of the effects of that change when he told him to hire Mr. Dale so that an engineer could recommend how much area was needed to compensate for the loss of volume in the pond. According to Mr. Arab's testimony, the work done by Liberty was necessary to support the foundation of the building as a result of the agreed-upon change to the walkway. Moreover, although Mr. Dale informed Mr. Curry of a number of issues with the pond, as evidenced in Exhibit 26, his testimony did not attribute fault to Liberty because he "did not evaluate anyone's design" and just looked at the conditions of the pond as he observed it.

The court accredited Mr. Arab's testimony that Liberty constructed the pond in a way that was necessary to support the foundation of the building and determined that the Currys did not provide sufficient proof of error.[11] "The weight, faith, and credit to be given to any witness's testimony lies in the first instance with the trier of fact, and the credibility accorded will be given great weight by the appellate court." *Forrest Constr.*, 337 S.W.3d at 233. In the absence of evidence that Mr. Arab's testimony with respect to the pond was

---

[11] Despite the court "accrediting" Mr. Arab's testimony, the Currys contend in their brief that the court did not make a credibility finding for any of the witnesses, but that, if it did, the court would have had to conclude that Mr. Curry and Mr. Dale were credible. Following this assertion, the Currys cited to instances of alleged "false testimony" by Mr. Arab, including an admission by Mr. Arab that he was aware that the Currys retained Mr. Dale after he previously testified otherwise. This change in Mr. Arab's testimony has no bearing on the testimony related to the actual construction of the pond; therefore, it is insufficient to overcome the court's decision to accredit his testimony on that issue.

not credible, we defer to the trial court's decision to credit Mr. Arab's testimony in this regard.

In further support of their argument that Liberty erred in construction of the pond, the Currys rely on *W.H. Lyman Construction Co. v. Village of Gurnee*, in which the appellate court of Illinois stated that a "contractor has a duty to carry out the construction in accordance with the plans and specifications agreed upon and can depart from them only at its peril." *W.H. Lyman Constr.*, 475 N.E.2d 273, 284 (Ill. Ct. App. 1985). However, this statement of law does not support the Currys' argument. The testimony demonstrates that Liberty's deviation from the original plans in removing the walkway was a change that was agreed upon, and requested by, Mr. Curry. Thus, the Currys failed to establish that Liberty did not comply with its duty to build according to Mr. Curry's specifications, which deviated from the original construction plans. The facts of this case are more analogous to *United States v. Spearin*, where a contractor constructed a sewer in accordance with the plans and specifications provided by the government, and the Supreme Court wrote that, "if the contractor is bound to build according to plans and specifications prepared by the owner, the contractor will not be responsible for the consequences of defects in the plans and specifications." *Spearin*, 248 U.S. 132, 136 (1918). We affirm the trial court's determination that the Currys failed to prove that Liberty was responsible for the defects that arose as a consequence of complying with Mr. Curry's request to remove the walkway.

After the court determined that there was insufficient proof to establish that Liberty erred in its construction of the pond, the court went on to state that, "even if there was an error by [Liberty], as analyzed above, the [Currys] cannot recover because [Liberty] was not provided an opportunity to cure." We must determine whether the evidence preponderates against this determination.

The email forwarded to Mr. Arab shows that Mr. Curry only typed a question mark in the body of the email. The forwarded portion of the email sent by Mr. Dale, along with Mr. Curry's question mark, however, constitutes sufficient notice. Although the email expressly stated that Mr. Dale "ha[d] little faith that any instruction [he] [would give] the Contractor [would] be followed" and recommended another company to perform repairs, Tenn. Code Ann. § 66-36-103 only requires that Liberty be allowed an opportunity to assess each alleged defect and given "reasonable access" to determine the cause of the defects and to notify Mr. Curry of its intent to remedy them. Based upon Mr. Arab's testimony that he recommended that Mr. Curry hire an engineer to assess what needed to be done to compensate for the loss in volume of the pond, we conclude that Liberty made it known that it intended to remedy the issue, despite the fact that it did not provide Mr. Curry with written notice to that effect. Liberty does not assert, nor is there any evidence, that Mr. Curry prevented it from accessing the pond or otherwise interfered with any attempts to repair the defects. Therefore, we conclude that, in the absence of evidence that it was denied reasonable access, Liberty had a reasonable opportunity to cure the alleged defects.

Although we reverse the court's holding that Liberty was not provided an opportunity to cure, we affirm the determination that the Currys failed to establish that the defects in the pond were caused by Liberty's error in construction.

*D. Prejudgment Interest*

The Currys do not dispute that Liberty is entitled to prejudgment interest; but they contend that the court erred in finding that prejudgment interest commenced on November 10, 2014, when the notice of completion was filed. The Currys argue that prejudgment interest did not begin to accrue until June 29, 2018, the date when Liberty articulated an amount of the costs for completion of the Market Finish bays in its response to the Currys' second set of interrogatories.[12] They assert that Liberty is not entitled to prejudgment interest until the amount due for the Market Finish was established.

"An award of prejudgment interest is within the sound discretion of the trial court and the decision will not be disturbed by an appellate court unless the record reveals a manifest and palpable abuse of discretion." *Myint v. Allstate Ins. Co.*, 970 S.W.2d 920, 927 (Tenn. 1998) (citing *Spencer v. A-1 Crane Serv., Inc.*, 880 S.W.2d 938, 944 (Tenn. 1994); *Otis v. Cambridge Mut. Fire Ins. Co.*, 850 S.W.2d 439, 446 (Tenn. 1992)). "This standard of review clearly vests the trial court with considerable deference in the prejudgment interest decision." *Id.* An abuse of discretion occurs if a trial court causes an injustice to a party by "(1) applying an incorrect legal standard, (2) reaching an illogical or unreasonable decision, or (3) basing its decision on a clearly erroneous assessment of the evidence." *Lee Med., Inc. v. Beecher*, 312 S.W.3d 515, 524 (Tenn. 2010).

The standards governing prejudgment interest were considered by the Supreme Court in *Myint v. Allstate Insurance, Co.*, where the trial court awarded prejudgment interest to the plaintiffs and the intermediate appellate court held that the trial court abused its discretion in awarding prejudgment interest when the amount due was not certain and the plaintiffs' right to recovery was reasonably disputed by the defendant. *Myint*, 970 S.W.2d at 926-28. The Supreme Court first noted that prejudgment interest was awarded pursuant to Tenn. Code Ann. § 47-14-123. *Myint*, 970 S.W.2d at 927. Pursuant to that statute:

> Prejudgment interest, i.e., interest as an element of, or in the nature of, damages, as permitted by the statutory and common laws of the state as of April 1, 1979, may be awarded by courts or juries in accordance with the principles of equity at any rate not in excess of a maximum effective rate of ten percent (10%) per annum.

---

[12] The Currys incorrectly identify this document as Exhibit 42; the document the Currys rely on is actually contained in Exhibit 22.

In establishing when an award of prejudgment interest is equitable, the Court stated, "[t]he uncertainty of either the existence or amount of an obligation does not *mandate* a denial of prejudgment interest," and a trial court's decision to grant prejudgment interest is not an abuse of discretion if the award was "otherwise equitable." *Id.* at 928. Furthermore, "[t]he certainty of the plaintiff's claim is but one of many nondispositive facts to consider when deciding whether prejudgment interest is, as a matter of law, equitable under the circumstances." *Id.* The Court articulated the following test for determining the certainty of damages:

> The test for determining whether the amount of damages is certain is not whether the parties agree on a fixed amount, for a fixed amount would be a liquidated claim, and the plaintiff would have a right to collect interest under Tenn. Code Ann. § 47-14-109(b). Instead, the test is whether the amount of damages is ascertainable by computation or by any recognized standard of valuation. This is true even if there is a dispute over monetary value or if the parties' experts compute differing estimates of damage.

*Id*. (citations omitted).

Applying this test to the facts in the record before it, the *Myint* Court determined that the award of prejudgment interest was equitable because the amount of damages was "ascertainable by two well-accepted methods of valuation: by estimation of the cost to repair the fire damage, and by calculation of the difference between the market value of the house prior and subsequent to the fire." *Id.* at 929. The fact that the values were contested by the parties did not preclude an award of prejudgment interest. *Id.* The Court further noted that the jury had determined that the plaintiffs "were legally entitled to the insurance proceeds," "were without the use of those proceeds from the date of the loss . . . to the trial court's judgment," and that, "[d]uring that time, [defendant] had full use of the funds"; therefore, the plaintiffs could not be fully compensated without the award of prejudgment interest. *Id.* The Supreme Court affirmed the trial court's decision to award prejudgment interest from the date the defendant denied the plaintiffs' insurance claim and acknowledged that, "as a matter of law, we are constrained to sustain the trial court's judgment, even if we were to disagree with it." *Id.*

Under the test articulated in *Myint*, we conclude that the amount due to Liberty was ascertainable on November 30, 2014, when Liberty first provided the Currys with a ledger of the costs expended and invoices that reflected the total amount due for the construction under the stipulated sum contract and the cost-plus contract. Therefore, we conclude that the amount due Liberty was reasonably ascertainable as of November 30, and that Liberty was without full use of those funds from that date to the entry of the court's judgment. The trial court did not make any findings that would support the determination to commence prejudgment interest earlier, on November 10; absent any evidence that costs were

ascertainable at that time, we conclude that the decision was not based on a proper assessment of the evidence. We therefore reverse and remand for additional findings.

### III. CONCLUSION

For the foregoing reasons, we affirm in part, reverse in part, and remand. We reverse the trial court's determination that the Currys were not entitled to a credit for certain payments made directly to suppliers, that prejudgment interest commenced on November 10, 2014, when the notice of completion was filed, and that the Currys did not provide Liberty with notice and an opportunity to cure. In all other respects, we affirm. Costs of this appeal are assessed against the appellants, Patricia P. Curry and Peter H. Curry, and execution may issue if necessary.

_____
ANDY D. BENNETT, JUDGE